# Illinois Official Reports

## Appellate Court

---

*Maurissa J.B. v. Ingrida K.*, 2019 IL App (2d) 190107

---

| | |
|---|---|
| Appellate Court Caption | MAURISSA J.B., Petitioner-Appellee, v. INGRIDA K., Respondent-Appellant. |
| District & No. | Second District<br>No. 2-19-0107 |
| Filed | December 5, 2019 |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 19-OP-23; the Hon. Mary H. Nader, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Dane J. Loizzo, of Law Office of Loizzo & Loizzo, of Woodstock, for appellant.<br><br>Renee A. Buxton, of Crystal Lake, for appellee. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion.<br>Justice Burke concurred in the judgment and opinion.<br>Justice Jorgensen dissented, with opinion. |

**OPINION**

¶ 1    Respondent, Ingrida K., appeals from a plenary order of protection entered against her for the protection of F.K., born May 20, 2011, the daughter of Ingrida's husband, Thomas K. (Tom), and petitioner, Maurissa J.B. Maurissa and Tom never married. On appeal, Ingrida argues that the evidence was insufficient to support the plenary order of protection and that the remedy imposed by the trial court, prohibiting all contact between Ingrida and F.K. for two years, is too harsh. We reverse.

¶ 2                                         I. BACKGROUND

¶ 3    From 2013 to sometime in 2016, Maurissa was incarcerated in Wisconsin for 2½ years. During Maurissa's incarceration, F.K. lived with Tom in Antioch. In April or May 2014, when F.K. was almost three years old, Ingrida moved into Tom's home with her daughter, Victoria. In November 2014, Ingrida and Tom had a son, Dillan. In June 2017, the trial court entered a parenting order that provided that F.K. would reside with Tom. The order also provided that Maurissa would have parenting time with F.K. every other weekend, during spring break, and for three consecutive weeks during summer break. In addition, Maurissa and Tom would alternate holidays. In December 2018, Ingrida and Tom hired Belle Gramer as a nanny for their children. Belle quit this job in early January 2019.

¶ 4    On January 7, 2019, Maurissa filed a petition seeking an emergency order of protection pursuant to the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 through 401 (West 2018)). The petition alleged the following. Since F.K. had lived with Tom and Ingrida, "about 4½ years," Ingrida "has been emotionally abusive to [F.K.]" On December 12, 2018, Ingrida pulled F.K. by the hood and yelled at F.K., "you lie to me now what is going to happen when you get older, you are going to land up in jail." On the same day, Ingrida also shamed F.K. in front of another child and made fun of her in front of a boy at the bus stop. On December 14, 2018, Ingrida shoved F.K. and emotionally abused her. On January 2, 2019, Ingrida beat F.K. with a wooden spoon, pushed her, and told her to get up and walk. On the same day, Belle heard Ingrida hitting F.K. and F.K. crying. On January 3, 2019, F.K. told Belle that she is afraid of Ingrida, that Ingrida hits her all over her body with a wooden spoon, and that most of F.K.'s bruises are on her legs so that no one can see them. On January 4, 2019, F.K. told Maurissa that Ingrida hit her, and Maurissa saw a bruise on F.K.'s right thigh.

¶ 5    The trial court, Judge Mark Gerhardt presiding, granted the emergency order of protection the same day it was filed. The trial court's order stated that Tom is F.K.'s primary caretaker. The court found that F.K. had been abused by Ingrida, and it ordered Ingrida to stay at least 200 feet away from the residence in Antioch while F.K. is present. The court granted Maurissa "the physical care and possession of [F.K.]" However, the court reserved Maurissa's request for temporary custody of F.K.

¶ 6    On January 17, 2019, the following colloquy occurred while the trial court and the parties were discussing scheduling a hearing on the entry of a plenary order of protection:

            "THE COURT: I still have a lot of things on my call to get rid of. Is there any possibility that you can come back at 2:30 or 3 this afternoon?

            MS. KUZNIEWSKI [(MAURISSA'S ATTORNEY)]: I have an appointment with my accountant.

THE COURT: You do?

MS. KUZNIEWSKI: It's so hard to get into see her. Otherwise I would try and reschedule it.

MR. LOIZZO [(INGRIDA'S ATTORNEY)]: *I could make that work, Judge. \*\*\* My problem is my client is living in a hotel because she can't live in the house.*

MS. KUZNIEWSKI: *My client would be willing to keep the child with her until that time—until the time of the hearing.*

MR. LOIZZO: I'm sure she would.

MS. KUZNIEWSKI: Absolutely." (Emphases added.)

¶ 7    The hearing on the entry of a plenary order of protection occurred before Judge Mary H. Nader on January 18, 23, and 24, 2019. Maurissa testified as follows. Maurissa married Matt B. in June 2016. Maurissa and Matt live in St. Charles, and they "have [Matt's] girls," nine-year-old twins, Angelica and Elizabeth, "part-time." F.K. lives with Tom and Ingrida.

¶ 8    Maurissa testified that on or about January 3, 2019, she received a message through Facebook from Belle and her mother, Karena Gramer. On January 4, Maurissa attempted to obtain an order of protection at the Kane County courthouse on behalf of F.K. and against Ingrida. Maurissa was sent to the McHenry County courthouse, where she filed for the emergency order of protection on January 7, 2019. While F.K. was at Maurissa's home the weekend of January 4, 2019, she was not her usual bubbly self and had a bruise on her right thigh. When F.K. was at Maurissa's home the weekend prior to Maurissa's testimony, while the emergency order was in place, F.K. was "a little more bubbly, a little more smiley, a little more outgoing than normal." When Maurissa took F.K. back to Tom's house on Sunday, "[s]he just did not want to go home. She was crying. She said this is all my fault. You know, how can I fix the situation." F.K. had no behavior problems at school, and her report card said that F.K. was "a ray of sun shine [*sic*]." F.K. had no behavior issues at Maurissa's home except once she was punished for not brushing her teeth and she had to go to bed five minutes early.

¶ 9    During direct examination by Ingrida's attorney, Maurissa testified as follows. The emergency order of protection required Ingrida to be out of her house while F.K. was present. While the emergency order of protection was in effect and when F.K. was at Tom's house, Maurissa asked police to go there for "wellness checks," "[j]ust to make sure [F.K.] was okay."

¶ 10   Belle testified as follows. From December 10, 2018, until January 3, 2019, Belle worked for Ingrida and Tom in their home as a nanny for three children: 4-year-old Dillan, 7-year-old F.K., and 11-year-old Victoria. Belle testified that she worked in Ingrida and Tom's home for four weeks and slept in the home for a total of 10 nights. F.K. visited Maurissa once in a while, and Victoria visited her father once in a while. Karena worked with Ingrida and recommended Belle to her. Dillan was Ingrida and Tom's son. Belle was pregnant and 21 years old when she began working for Ingrida and Tom. Belle lived with her boyfriend when she was not staying at Ingrida and Tom's home. When Belle slept at the home, she slept in the basement, and the family slept upstairs. F.K. and Victoria shared a bedroom.

¶ 11   Belle testified that, on December 10, 2018, while Ingrida drove Belle from her home in Milwaukee to Ingrida and Tom's home, Belle became concerned for F.K. because of things Ingrida said about her. Ingrida told Belle that "there was something wrong with [F.K.], and that she had bad genes from both her parents, and \*\*\* she would end up in jail just like her mom." When Belle and Ingrida arrived home that evening, Ingrida and Tom left the house,

- 3 -

and Belle watched the children and played a board game on the floor with F.K. and Victoria. When Ingrida and Tom returned home, Ingrida saw Belle and F.K. on the floor together and "started yelling for [F.K.] to stay away from [Belle], and that [Belle is] pregnant, and [Ingrida] said [to F.K.], what's wrong with you, and [Ingrida] told [Belle] that [F.K.] always seeks attention from everyone that comes over." Ingrida then told F.K. to "play with her own things and go play by herself." F.K. walked off with her head down. F.K. looked "pretty skittish like she didn't know which way to walk to, and what to do with herself."

¶ 12    Belle testified that the morning of December 12, 2018, while she and Ingrida were leaving the house to take F.K. and Dillan to the bus stop, F.K. opened the door, stepped back, and accidentally stepped on Dillan's foot. Dillan said "ow." Belle testified that Ingrida "grabbed [F.K.] by the hood and yanked her back and yelled at her, saying, "What's wrong with you? He's just a baby. Why would you do that to a baby? What kind of a sister are you?" When they walked outside, Ingrida continued to yell at F.K. about lying to her the night before, saying "Oh, you lie to me now. What are you going to be like when you get older? Are you going to be like one of the bad kids? Are you going to be in jail like your mom?" At the bus stop, Ingrida asked a little boy if F.K. was good on the bus and the boy nodded. Ingrida said, "All my years of yelling at you paid off finally." F.K. was not allowed to look at anyone or speak to anyone at the bus stop. F.K. had to stand in one spot and could not play with anyone, while Dillan got to play. When F.K. looked at Dillan, Ingrida yelled at her.

¶ 13    Regarding the reference to lying, Belle testified that, after school on December 11, 2018, F.K. told her that she had erased something on her homework. F.K. told Belle that she was scared and did not want Ingrida to know that she did not "get a perfect A" because she would get in trouble. Later that night, Belle heard F.K. crying as Ingrida said, "Why are you crying, I didn't even hit you." Ingrida grounded F.K. for lying to her about the homework.

¶ 14    Belle also testified that, during her first week of work, Ingrida often yelled at F.K. during dinner when she looked at Belle and when she pressed her stomach against the table as she ate. Ingrida grounded F.K., which meant that she could not watch television and had to read or do homework upstairs. One day after school, Belle began a conversation with F.K. because she was concerned about F.K. During the conversation, F.K. appeared "nervous." F.K. looked down and seemed afraid to tell Belle some things. During dinner one evening, F.K. left the room after Ingrida yelled at her, and Ingrida said that F.K. was "the bad kid" but that Victoria was "getting A's" and "was perfect."

¶ 15    Belle testified that on December 26, 2018, Ingrida drove her from Milwaukee to Antioch. During that car ride, Ingrida told Belle that the previous year F.K. bragged about her Christmas presents and "that she must have been a good kid in Santa's eyes because she got so many toys and then this year Victoria and Dillan got lavished in gifts, where [F.K.] did not, and [F.K.] was upset." Ingrida told Belle that, this Christmas morning, Ingrida asked F.K. what was wrong and F.K. said, "you'll be mad." Ingrida told F.K. that she would not be mad, and F.K. told Ingrida that Santa did not get her many gifts this year. Ingrida replied, "that's because you did not listen to me. Santa was checking his list twice."

¶ 16    Belle testified that on January 2, 2019, at about 8 p.m., she was in the basement and Ingrida and F.K. were upstairs. F.K. had been sent to bed already, and it sounded like they were either in F.K.'s bedroom or in the bathroom. Belle heard very loud yelling. Belle testified,

"After 15 minutes, it wasn't stopping, and it was just bad. I heard threats. I heard [F.K.] screaming and crying and I would hear a bang, and then [F.K.] cry, let out a cry, and

- 4 -

say ow and then I would hear Ingrid[a] say that was an accident. I would hear her say: You did that to yourself. Or, I would hear her say: Well that was because I pushed you, because I spanked you, because I yelled at you. And then I hear Ingrida say: I'm going to get the wooden spoon. Do you want me to get the wooden spoon? I'm going to hit you. It's going to hurt."

¶ 17   Belle testified that, after about 30 minutes, Belle heard Tom intervene and say, "are you done yet?" At one point, Belle heard Ingrida tell F.K. to "get up and walk [and] to stop pretending." Ingrida kept asking F.K. to "explain herself" and then told F.K. to "shut up." Belle heard F.K. repeatedly scream, "ow," to which Ingrida replied, "you are talking back to me again." After Tom came into the room, he and Ingrida spoke for about five minutes, and then Tom said, "[F.K.], get out of the room." The screaming ended. Ingrida left the house to go to a work Christmas party. Belle went upstairs to F.K.'s room. F.K. was in her bed and seemed "normal." Belle told F.K. that she had heard everything and was sorry for her, and then she held F.K. Belle testified that F.K. "seemed like a shocked little kid, not really emotional." The next day, Belle took the children to the bus stop and went back to the house to call Karena. Belle wanted to report the incident to the police. She quit her job that day, January 3, 2019. Belle and Karena went to the police station to report the incident.

¶ 18   During cross-examination, Belle explained that F.K. had lied about a homework assignment. F.K.'s teacher wrote on her assignment because she did not get a "perfect A." F.K. erased what the teacher wrote and instead wrote, " 'good day.' " The following day, F.K. accidently stepped on her brother's foot, and Ingrida yelled at F.K. for lying the day before.

¶ 19   Karena testified as follows. At the time of the hearing, Ingrida was Karena's manager. They worked together at a restaurant from 2011 to 2014. In November 2014, Ingrida stopped working at the restaurant because she gave birth to Dillan. In 2018, Ingrida began working at the restaurant again, with Karena. In August 2014, Karena observed F.K. and Ingrida at a work cookout. Ingrida incessantly yelled at F.K. to eat her food. F.K. sat at her plate, crying. Ingrida yelled, loudly, in the presence of others, "eat your food, eat your food." Ingrida took a phone call, and when the call was over, she said, "I can't help it. Tom gets me so mad I take it out on [F.K.]" F.K. remained seated, still crying.

¶ 20   Karena further testified that, in 2015, she met Ingrida at a restaurant. Dillan was also present. During their meeting, Ingrida received a phone call. When Ingrida ended the call, she told Karena that Tom had just called and told her that F.K. was ill and needed to be picked up from day care. Ingrida then left the restaurant for about 30 minutes and returned with F.K. Karena testified that, when Ingrida entered the restaurant, she "[g]rabbed [F.K.] by the arm; and she forced her into the booth and told [F.K.] to sit there and be quiet." F.K. appeared sad and "had her head hung down." F.K. sat slouched in the corner of the booth. Ingrida gave F.K. some food. When it was time to leave the restaurant, Ingrida screamed at F.K. so loudly that "every patron turned their head to see what was going on."

¶ 21   Karena testified that, in September 2018, she visited Ingrida's home. It was dinnertime, and Ingrida realized that she did not have any milk, so she went to the store. While Ingrida was gone, Karena tried to have a conversation with F.K., but F.K. "was very quiet." F.K. sat at the dinner table, "up right, very quiet, just eating her dinner." Later, when Ingrida returned to the house, Karena asked Ingrida where F.K. was because "she had been gone most of the night." Ingrida told Karena that F.K. was in her bedroom. Karena went to F.K.'s room "to check on her," and F.K. "was laying there watching T.V."

¶ 22    Karena testified that, in October 2018, Ingrida spoke to her about Maurissa while they were in Ingrida's kitchen. F.K. was also present. Karena asked where Maurissa lived, and Ingrida replied, "she lives in St. Charles, Illinois *** thank God or—or [the] bitch would be coming to every school event we have." Karena testified that F.K. was "a couple of feet" away from Ingrida when she made this statement about F.K.'s mother.

¶ 23    Karena testified that, while at work, Ingrida told her that F.K. inherited Tom's attention deficit disorder (ADD) genes. Karena also testified that the last time she saw F.K. was on December 18, 2018, when she picked up Belle from Ingrida and Tom's home. When Karena entered the house, she saw F.K., said hello to her, and told F.K. to come to her. F.K. went to Karena, gave her a hug, and "retreated to her room pretty much right away." Later, when F.K. came into the living room, Ingrida said to her, "Oh, my God, what are you doing here[?] She's not here to see you." F.K. put her head down, sat at the kitchen table with her back to the others, and read a book.

¶ 24    Karena testified that, on January 1, 2019, she spoke with Ingrida at Karena's home. Ingrida was picking up Belle to drive her to Ingrida and Tom's home to work. Ingrida told Karena that F.K. had lied to Ingrida five times about breaking an umbrella. Ingrida also told Karena that F.K. had said that "she wasn't too good but Santa still brought her presents." Ingrida said that she bought F.K. very few gifts but that she bought Victoria and Dillan "a lot of presents." Karena asked Ingrida why she did not have F.K. live with Maurissa since she did not seem to like F.K. Ingrida replied that "they get $400 a month from Maurissa for child support. And if *** [F.K.] wound up going there they would probably have to wind up paying [$600] a month."

¶ 25    Ingrida testified as follows. F.K. called Ingrida "Mommy." F.K. had some issues with paying attention and focusing. Ingrida told Karena that Tom had been diagnosed with attention deficit hyperactivity disorder (ADHD) when he was younger. Ingrida also told Karena that F.K.'s lying "must be coming from Maurissa."

¶ 26    Ingrida also testified that lying was not allowed. For example, Victoria recently lied, and "she lost her phone for whole January [sic]." "Usually we cut small things from [F.K.]" In December, Ingrida and Tom punished F.K. because she changed the colors on her assignment book that indicated the teacher's report to the parents. "F.K. changed the colors to make her look better." F.K.'s punishment was the loss of 30 minutes of TV before bedtime for about "one and a half week [sic] in December."

¶ 27    During cross-examination, Ingrida testified as follows. While leaving for the bus stop on December 12, 2018, F.K. intentionally stepped on Dillan's foot. For most of the two-minute walk to the bus stop, Ingrida loudly told F.K. not to hurt her brother and spoke to F.K. about her past lying. When they arrived at the bus stop, Ingrida stopped, as counsel phrased it, "yelling."

¶ 28    Regarding Christmas 2018, Ingrida testified as follows. F.K. made a list of 10 gifts for Santa. Victoria's list had one item. Dillan was too young to prepare a list, so he pointed things out on TV that he wanted. Each child had a stocking, which was stuffed and depicted in a photo that was admitted into evidence. The photo shows F.K.'s stocking as full, "if not more so than the other two." Each child received six presents from Santa. But F.K. was upset because she did not receive all ten gifts on her list. Ingrida explained to F.K. that Santa is always watching and that, if she behaves better and stops lying, she might get more presents next year. Ingrida testified that she told F.K., "Maybe you should change your attitude and start listening to

Mommy, Daddy, and teachers." However, F.K. did not receive fewer gifts than Victoria or Dillan.

¶ 29    Ingrida testified that on the evening of January 2, 2019, she was getting ready for a work Christmas party and heard Victoria yelling at F.K. about leaving her clothes on the floor. So Ingrida went to the girls' bedroom and yelled at Victoria. Ingrida testified that she told Victoria, "Why you keep yelling at her[?] I keep telling you come to me and tell me something." Then Ingrida saw F.K.'s clothes on the floor and her shoes on the bed, which was against the rules, and Ingrida began yelling at F.K. F.K. began to talk back to Ingrida. Eventually Ingrida spanked F.K. once, using her fingers only, on the "left side of the butt." F.K. cried. Ingrida said, "I didn't even touch you." Ingrida told F.K. to remove her shoes from the bed and put them where they were supposed to be. As F.K. was complying, she knocked onto the wood floor the wooden stepladder that was used to reach the top bunk bed. Tom came in at some point and told Ingrida to stop yelling at F.K. Ingrida complied, left F.K.'s room, and argued with Tom.

¶ 30    Ingrida denied that she shoved F.K., hit her with a wooden spoon, spanked her anywhere other than on her "butt," hit her on her thigh, or treated her differently than her biological children. Ingrida testified that she "raise[d] [F.K.] from since she was three year [*sic*] old. *** [S]he always gets the same as Victoria." Ingrida denied telling Karena that she "would give [F.K.] back to her mother but for the child support."

¶ 31    On January 24, 2019, the trial court entered a plenary order of protection. In open court, the trial court stated, "what we're looking at here is not physical abuse." The trial court then stated that both Maurissa's and Ingrida's testimony was biased and self-serving. Conversely, Belle "was totally unbiased" and "Karena had a lot to lose." So the trial court relied on their testimony.

¶ 32    The trial court recounted each episode of alleged abuse as testified to by Belle and Karena. Regarding Belle's first encounter with F.K. when Ingrida "reprimanded" F.K. while they played on the floor, the trial court stated:

"Was it a basis for an order of protection? Absolutely not. But what it shows is the *environment or the atmosphere that was being created*." (Emphasis added.)

¶ 33    Regarding the August 2014 picnic episode as recounted by Karena, the trial court stated:

"Was it wrong? I don't know. I don't know if it was. But it goes back to the *atmosphere or the environment that was being created*." (Emphasis added.)

¶ 34    Regarding the 2015 restaurant incident the trial court stated:

"You don't bring a sick child to a restaurant and then give them food to eat. That makes no sense. [Ingrida] clearly was not acting in [F.K.]'s best interest. Again, big deal? No, not a big deal."

¶ 35    Regarding the Christmas gift incident, the trial court stated:

"To tell a seven year old on Christmas if you have been a good girl, you might have gotten everything you asked for, you need to be better, that was mean. *** Still, not the basis for an order of protection. Bad parenting? I think so. *** That's not fair."

¶ 36    Regarding the January 2, 2019, incident when Belle heard Ingrida yell at F.K. in her bedroom upstairs, the trial court stated:

"I'm not concerned with the spank. I never did it. I don't believe in it. But the law says that a spank is okay. So I have to accept that. And I have to follow the law.

But I think that night culminated because of *the environment and atmosphere that had been being created* all of this time, telling [F.K.] that she has bad genes, that she's going to go to prison like her mother, that she—she lies like her mother, that she can't pay attention because she has her dad's bad genes and he has A.D.H.D. or A.D.D.

Every time she said those things, she destroyed a little bit more of [F.K.] And I do think that that was harassment because it was conduct which was not necessary to accomplish a purpose that is reasonable under the circumstances and would cause a reasonable person emotional distress and does cause emotional distress because we talked about how [F.K.] would get quiet. How she would hang her head down. How she would look despondent. How she would look scared. So there is an issue.

And it does warrant an order of protection. Ingrid[a] is destroying [F.K.] And I'm not going to allow it any further." (Emphasis added.)

¶ 37 On a preprinted form, in the remedy section, the court marked that Ingrida "is prohibited from committing further acts/threats of abuse on protected persons [and] is ordered to stay away from [F.K.]" Ingrida was also prohibited from "[h]arassment, interference with personal liberty, physical abuse, or stalking *** [and] intimidation of [F.K.]" Ingrida was ordered to stay at least "200 feet away from [the] residence of petitioner and/or protected person(s) located at [Ingrida and Tom's home]." Finally, Maurissa "is granted the physical care and possession of [F.K.]" and "is granted temporary custody of [F.K.]"

¶ 38 On February 7, 2019, Ingrida filed a notice of appeal.

¶ 39                                    II. ANALYSIS

¶ 40 Ingrida contends that the trial court's plenary order of protection is against the manifest weight of the evidence because the evidence does not support a finding of harassment. We agree.

¶ 41 Proceedings to obtain an order of protection are civil and are governed by the preponderance-of-the-evidence standard. *Best v. Best*, 223 Ill. 2d 342, 348 (2006); see 750 ILCS 60/205(a) (West 2018). The Act provides that if "the court finds that petitioner has been abused by a family or household member," a protective order shall issue prohibiting the abuse. See 750 ILCS 60/214(a) (West 2018). A reviewing court will reverse a finding of abuse only if it is against the manifest weight of the evidence. *Best*, 223 Ill. 2d at 348-49. A decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 42 "Abuse" is defined to include physical abuse, harassment, or intimidation of a child but does not include reasonable direction of a child by a parent or person *in loco parentis*. 750 ILCS 60/103(1) (West 2018). A person *in loco parentis* stands in the place of a parent and assumes the rights, duties, and obligations of a parent. *Phillips v. Dodds*, 371 Ill. App. 3d 549, 552 (2007). The Act defines "harassment" as knowing conduct that is not necessary to accomplish a purpose that is reasonable under the circumstances, that would cause a reasonable person emotional distress, and that does cause emotional distress to the person. 750 ILCS 60/103(7) (West 2018).

¶ 43 Here, the trial court restated all of the alleged instances of abuse and harassment and found that not one individually was a basis for an order of protection. Instead, the trial court relied

- 8 -

on the overall "environment and atmosphere" reflected in statements that it believed Ingrida made to F.K. However, the record does not support the court's finding.

¶ 44     Again, the trial court stated:

"I'm not concerned about the spank [the night of January 2, 2019]. ***

But I think that night culminated because of the environment and atmosphere that had been being created all of this time, telling [F.K.] that she has bad genes, that she is going to prison like her mother, that she—she lies like her mother, that she can't pay attention because she has her dad's bad genes and he has A.D.H.D. or A.D.D.

Every time [Ingrida] said these things, she destroyed a little bit more of [F.K.] And I do think that was harassment because it was conduct which was not necessary to accomplish a purpose that is reasonable under the circumstances and would cause emotional distress. *** And it does warrant an order of protection. Ingrid[a] is destroying [F.K.] And I'm not going to allow it any further."

However, the trial court's finding of harassment was not based on evidence adduced at the hearing, and therefore, it is against the manifest weight of the evidence. There was no evidence that Ingrida told F.K. that she had bad genes, that she lies like her mother, that she cannot pay attention because she has her dad's bad genes, or that her father has ADHD or ADD. Although Ingrida made these comments to Belle and Karena, there was no evidence that Ingrida made them while F.K. was present. Based on the trial court's mistaken recollection of the testimony, the court mistakenly concluded that "[e]very time [Ingrida] said those things she destroyed a little bit more of [F.K.] And I do think that was harassment."

¶ 45     Emotional distress results from intentional acts that cause someone to be worried, anxious, or uncomfortable. *People v. Reynolds*, 302 Ill. App. 3d 722, 727 (1999). Because F.K. did not hear the comments that the trial court considered to be harassment, they did not support the determination that Ingrida harassed F.K. Accordingly, the trial court's finding of harassment was not based on the evidence presented and, therefore, is against the manifest weight of the evidence.

¶ 46     We note that several instances of Belle's testimony were about things she heard and not things she actually saw, such as the interactions between F.K., Victoria, and Ingrida. Although the trial court found Belle unbiased, Belle was not an expert regarding the psychological impact of interactions between children and persons *in loco parentis*. Although expert testimony is *not* a *sine qua non* in cases involving psychological effects, the trial court's determination that the *environment* or *atmosphere* was injurious was based upon, at most, nonphysical, rather than physical, abuse. Furthermore, some of the reported instances of nonphysical abuse took place outside F.K.'s presence. These instances might have some relevance as a basis for an expert's opinion. Nevertheless, the evidence presented in this case that the *environment* or *atmosphere* was psychologically injurious was insufficient.

¶ 47     Further, it might not have been wise for Ingrida to yell at F.K. at the bus stop after she stepped on Dillan's foot, to yell at F.K. about lying to Ingrida, or to yell at F.K. in any instance. However, Ingrida believed that F.K. purposely stepped on Dillan's foot. In addition, Belle testified that F.K. did lie to Ingrida about her homework and did erase something on her homework. Thus, Ingrida could have reasonably believed that yelling at F.K. was reasonable under the circumstances. It also follows that a child's reaction to being reprimanded would be to, as the court stated, "get quiet," "hang her head down," and "look despondent." Although

Ingrida's methods of discipline might not have been the model of good parenting, we determine that, based on this record, the trial court's finding of harassment is against the manifest weight of the evidence.

¶ 48 Because we have decided that the trial court erred by entering a plenary order of protection, we need not address Ingrida's argument that the remedy imposed is too harsh.

¶ 49 III. CONCLUSION

¶ 50 The judgment of the circuit court of McHenry County is reversed.

¶ 51 Reversed.

¶ 52 JUSTICE JORGENSEN, dissenting:

¶ 53 I respectfully dissent. The issue before us is whether there was sufficient evidence presented to support the plenary order of protection. I believe that there was more than enough evidence to support the trial court's ultimate finding.

¶ 54 The majority relies on the trial court's citation to a series of statements by Ingrida and discerns that, since those statements were made neither to F.K. nor in her presence, they could not constitute harassment. Thus, the majority concludes, the court's finding is against the manifest weight of the evidence.

¶ 55 However, the majority takes those statements in isolation and disregards the balance of the record here. Indeed, the statement of facts set forth above is replete with examples of harassing words and conduct by Ingrida, not only uttered and committed in F.K.'s presence but repeatedly and deliberately directed at her. Further, the trial court explicitly found Belle and Karena, who testified to these recurring events, to be credible witnesses. The court's reiteration of additional statements made outside F.K.'s presence, gave context to Ingrida's conduct. It did not negate the credible evidence of Ingrida's conduct in F.K.'s presence. Moreover, in my opinion, the majority gives short shrift to the evidence of the conduct's effect on F.K.

¶ 56 Thus, I would conclude that there is ample evidence to support the trial court's finding and would affirm it.