NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200592-U

NO. 4-20-0592

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 12, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| ANTHONY MYERS, | ) | No. 19CF321 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas E. Griffith Jr., |
| | ) | Judge Presiding. |

---

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Harris and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  When all of the evidence is viewed in a light most favorable to the prosecution, a
rational trier of fact could find, beyond a reasonable doubt, that the defendant had
the state of mind necessary for the commission of knowing first-degree murder (720
ILCS 5/9-1(a)(2) (West 2018)), namely, knowledge that his acts created a strong
probability that the victim would suffer death or great bodily harm.

¶ 2    In the circuit court of Macon County, a jury found the defendant, Anthony Myers,

guilty of the knowing first degree murder of a two-year-old child, Ta'naja Barnes. See 720 ILCS

5/9-1(a)(2) (West 2018). The court sentenced Myers to imprisonment for 30 years. He appeals.

¶ 3    Myers argues that the evidence was insufficient to prove he had the guilty

knowledge required for the commission of knowing first degree murder. He requests, accordingly,

that we reduce his conviction of knowing first degree murder (*id.*) to the lesser offense of

endangering the life or health of a child (*id.* § 12C-5(a)(1), (d)).

¶ 4 We decline his request. Viewing all of the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond a reasonable doubt, that Myers had the state of mind required for knowing first degree murder, namely, knowledge that his acts created a strong probability of death or great bodily harm to Ta'naja. See *id.* § 9-1(a)(2). Therefore, we affirm the judgment.

¶ 5                                I. BACKGROUND

¶ 6                               A. The Information

¶ 7 The information had two counts. Count I alleged that on February 11, 2019, Myers committed knowing first degree murder (*id.* § 9-1(a)(2), (b)(7)) in that, without lawful justification, he "killed [Ta'naja]," born on March 14, 2016, "by removing the heat source from [her] bedroom [and] [by] failing to provide proper nourishment and hydration to [her], resulting in malnourishment, dehydration[,] [and] cold exposure." In performing those acts, count I continued, Myers "knew that such acts created a strong probability of death or great bodily harm to [Ta'naja]." Further, according to count I, her death "resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." Count II alleged that by the same conduct—by "failing to provide proper nourishment [and] hydration to [Ta'naja]" and by "removing the heat source from [her] bedroom"—Myers committed the offense of endangering the life or health of a child (*id.* § 12C-5(a)(1), (d)).

¶ 8          B. Evidence in the Jury Trial, Which Took Place in July 2020

¶ 9 Ta'naja was the biological daughter of Twanka Davis and Dartavius Barnes (hereinafter Barnes). Davis and Barnes used to reside together in Springfield, Illinois. They broke up, and when Ta'naja was about a year old, Davis began having a romantic relationship with Myers.

¶ 10 In 2017, Davis and Myers moved to Decatur, Illinois, where they took up residence together. Two children were in their household: Ta'naja and the biological son of Davis and Myers, who is referred to in the record and in the briefs as "Anthony Jr." (Later, at some point in time, Davis had a daughter by Myers. Their daughter's name appears to be unspecified in the record. It seems she was not yet born when Ta'naja died.)

¶ 11 On December 22, 2017, Barnes had Ta'naja over to his residence in Springfield for visitation, and he noticed some wounds on her arms, face, and back. The next day, he telephoned the Illinois Department of Children and Family Services (DCFS), which began an investigation. In the course of its investigation, DCFS visited Myers and Davis's house in Decatur. DCFS found the house to be strewn with trash and dog feces and infested with ticks and cockroaches. Ta'naja had a rash on her arm that looked like bites by bedbugs. In her bedroom was a mattress without sheets. The downstairs lacked heat. DCFS removed Ta'naja and Anthony Jr. from the residence.

¶ 12 At first, DCFS placed Ta'naja in Barnes's custody since Barnes was her acknowledged biological father. Subsequently, however, after finding that Barnes, too, had parental deficiencies, DCFS removed Ta'naja from his custody and placed her in foster care.

¶ 13 DCFS hired Webster-Cantrell Hall (Webster-Cantrell) in Decatur to prepare and administer a family service plan for Davis and Myers, to help them remedy their parental shortcomings and become fit to regain custody of the children. The family service plan included a parenting course. According to the testimony of Cynthia Cherry, a parenting instructor at Webster-Cantrell, Myers volunteered answers in class and was, by all appearances, intelligent. In the final class, he correctly identified hunger as a factor that caused a child to suffer stress. He successfully completed the parenting course, receiving a score of 96% on the final examination.

¶ 14        In addition to the parenting course, the family service plan included supervised visitation. IeMonei Bradford, a Webster-Cantrell caseworker, testified that she supervised visits between Myers, Davis, and Ta'naja in the spring and summer of 2018, when Ta'naja was in foster care. According to Bradford, Myers "interacted with [Ta'naja] as like [*sic*] a father figure in the household," and he made statements that he viewed Ta'naja "[l]ike a daughter." Another caseworker, Shawna Spence, testified that, except for an unwillingness to change Ta'naja's diapers, Myers treated Ta'naja no differently than he treated his biological son, Anthony Jr. The staff at Webster-Cantrell "considered [Myers] a parental figure to Ta'naja," and Myers never intimated that if Ta'naja were returned home, he would refuse to take care of her. Indeed, if Myers had so suggested, Spence further testified, Ta'naja may well have not been returned home. Myers's paternal behavior in supervised visitations was understood to be the treatment that Ta'naja would receive from him at home after DCFS closed the case.

¶ 15        Amanda Beasley-Ricks, the director of foster care at Webster-Cantrell, supervised some of the visitations. She testified that whenever she was present in the Decatur residence, there was always food in the house. She remembered seeing Ta'naja in the kitchen eating noodles and potato chips. She did not recall Ta'naja's ever refusing food. Myers and Davis's home had been brought up to par. The home now met minimal parenting standards in that it had food and running water, was clean, and was free of environmental hazards. With funding from a local governmental program, a new furnace had been installed. Therefore, in August 2018, Ta'naja was returned to the custody of Davis and Myers, and on October 24, 2018, the child-neglect case was officially closed. In October 2018, when Beasley-Ricks last saw Ta'naja, she did not appear to be malnourished. No cause for continued concern was apparent in the Myers and Davis household. To quote from his

brief, Myers "had complied with all services, assumed a parental role with [Ta'naja], and agreed to care for her."

¶ 16    Barnes testified that when he last saw Ta'naja, in an October 2018 court hearing, she looked healthy. He was not allowed to have her over to his house anymore. He testified that after Davis and Myers regained custody, Myers refused to allow him to visit Ta'naja even though Barnes requested visitation and tried to repair his relationship with Myers. October 2018 was the last that Barnes would ever see his daughter.

¶ 17    At 7:48 a.m. on February 11, 2019, a 911 dispatcher received a telephone call from Davis that Ta'naja was unresponsive and not breathing. Over the phone, the dispatcher began explaining how to perform mouth-to-mouth resuscitation, directing Davis, first of all, to open the child's mouth and to pinch the nostrils shut. Davis could be heard requesting Myers to assist her. We quote from a transcript of the 911 call:

> "Twanka Davis: I can't get her mouth open to get the food out. Baby, I need your help! I need your help. . . . (Unintelligible) you have to come help! I need your help.
>
> * * *
>
> Anthony Myers: I think she choked on some food but I'm not sure. But, my fiancé[e], she was just fine before we went to bed last night we just—
>
> Dispatcher: Okay, I—
>
> Anthony Myers: —gone to picked up some food. My girl went up there—
>
> DAS [(presumably, Distributed Antenna System)]: She's been awake?
>
> Anthony Myers: Yeah, she's been awake.
>
> Twanka Davis: . . . she was walking (Unintelligible)

Anthony Myers: She's been up. She's been up. She just went in there and she gave her some food. I was in here with my son—."

¶ 18 Police and paramedics arrived and went upstairs. Ta'naja was lying on a bedroom floor, wrapped in a dirty blanket that reeked of urine and excrement. Photographs of the blanket are in the record. (The blanket had such an overpowering odor that it could not be brought into the courtroom.) In one of the photographs, the blanket has a hole that goes all the way through, showing that the blanket is uninsulated. In other words, it was not a quilted blanket; it had no insulating padding in the middle. It was a rather thin, tattered blanket, made of plush material, on which was printed an owl in a forest scene.

¶ 19 Ta'naja's eyes were open but glazed over. The lower part of her body was covered in dirt and excrement. There was discoloration or bruising around her right ankle. Her back and hair were smeared with excrement and dirt. In her bedroom was a mattress on a bedframe, without a pillow or a blanket. On the floor of her bedroom, among child feces, were an empty vodka bottle and a few microwave food containers, all of which were empty except for one that contained what appeared to be red beans, rice, and noodles. Under the bed were scraps of paper that appeared to have been gnawed by a rodent. The whole house was grimy, littered with trash, beer cans, liquor bottles, rotten food, soiled diapers, and the feces of humans and rats.

¶ 20 Ta'naja was taken to the hospital, where, at 8:06 a.m. on February 11, 2019, she was officially pronounced dead. At the time of the death pronouncement, her body temperature was measured to be 32 degrees Fahrenheit, the temperature of ice. (Hereafter, whenever we speak of degrees, we mean degrees Fahrenheit.)

¶ 21 Two Decatur police officers, Sean Bowsher and James Wrigley, testified that when they arrived at the house at 8:40 a.m. on February 11, 2019, the outside temperature was

approximately 30 degrees, and the downstairs thermostat, which was set at 75 degrees, indicated that the indoor temperature was 45 degrees. A photograph of the thermostat was admitted in evidence. In the photograph, the thermostat reads, "HEAT ON" and "Set At 75," but the thermostat indicates that the "Room Temperature" is "48°F." It had been cold outside for the past few days, the police officers testified. On February 10, 2019, the high was 33 degrees, and the low was 19 degrees. On February 9, 2019, the high was 27 degrees, and the low was 8 degrees.

¶ 22    Two space heaters were observed in the bedroom in which Myers, Davis, and Anthony Jr. had spent the night. There was no space heater, however, in Ta'naja's bedroom.

¶ 23    On February 12, 2019, a forensic pathologist, Dr. Scott Denton, performed an autopsy on Ta'naja. In the autopsy, he weighed the body: she was only 21 pounds. The prosecutor asked Dr. Denton:

> "Q. And where did that fall in terms of percentiles for her age group?
>
> A. Percentile for her—her two years and ten months was below the measurable scale. Like I said, it was much less than the 5th percentile for her age."

¶ 24    In his exterior examination of Ta'naja's body—besides finding her body to be filthy—Dr. Denton found "multiple scars that were unusual for a child of two years and ten months old." He described the scars as follows:

> "She had circular scars, linear line scars. She had a larger line scar across her abdomen, and that was three inches long, that went across her abdomen that was thin. She had multiple scars on her—dot-type scars on her abdomen, her arms, both of her arms, her forearms, her legs, her back. The buttock had a circular scar that was a little bit more than half an inch in circular diameter, and then she had additional scars on the mid right back and the right upper back.

Q. Were those scars consistent or inconsistent with physical abuse?

A. For a two-year-old child, two-year and ten-month-old child, those scars indicate past trauma or injury that had healed and scarred over, so that would be consistent with nonaccidental injury."

¶ 25 In his internal examination of Ta'naja's body, Dr. Denton found evidence of dehydration and chronic malnutrition. The thymus gland was shrunken and severely atrophied, as happened when someone was starved. "For the tissue itself and the organ to recede like that," Dr. Denton opined, "it's not a short process. It's—I would say it's at least several weeks to many months or possibly a month." In her stomach, Ta'naja had submucosal hemorrhages, which were indicative of hypothermia. Such "petechiae within the stomach," Dr. Denton explained, were the result of "[b]eing exposed to cold that causes your body to kind of shut down and cause[s] those bleedings in your stomach." In Ta'naja's colon, he found "a lot of firm, dark, green fecal material, basically constipation," the result of "dehydration, and also not eating adequate food." The swelling that Dr. Denton found in Ta'naja's brain, the high nitrogen content in her kidneys, and the "severe elevation of sodium and chloride" in her eye fluid were, he explained, further indications of "chronic and ongoing" dehydration.

¶ 26 The prosecutor asked Dr. Denton:

"Q. Do you have an opinion as to what symptoms you would expect a child in Ta'naja's condition to exhibit in the days leading to her death?

A. The most common symptoms, a person who's starving or dehydrating or suffering cold exposure is basically lethargy. They basically are just—their systems are shutting down, so they're quiet. They're not really crying, they're not in any kind of distress. They just kind of fade away and go into a coma and die.

Q. Would you expect someone in her condition to be trying to eat and drink?

A. Yes, I would. I would expect someone to try to find and get food, yes, and drink water.

Q. And then do you have an opinion as to the period of time in which Ta'naja would have been able to survive in a cold environment in the condition that she was in?

A. By what I saw with the cold exposure ulcers and the environment, I would say she would die of cold exposure within hours.

Q. When you say within hours, do you have any range of hours?

A. Again, it depends on the temperatures and the environment. Her body temperature, I believe, was recorded at 32 degrees from the medical records I reviewed, so that's—at max, that's hours. It could be less.

Q. Do you have an opinion as to the immediate cause of death of Ta'naja Barnes?

A. Right. So the immediate cause of death would be cold exposure due to environmental neglect.

Q. And what, if any, significant contributing factors were there to her death?

A. Those other conditions of dehydration and malnutrition, also due to neglect."

¶ 27       The parties entered into a stipulation regarding three medical examinations that Ta'naja underwent in 2018, when she was still in the custody of DCFS. In each of the examinations, she was weighed. On January 26, 2018, she weighed 22.2 pounds. On April 12,

2018, she weighed 22.6 pounds. On July 18, 2018, she weighed 25.8 pounds. In all three medical examinations, she was found to be in good health.

¶ 28    The State called Davis as a witness. She was in custody, having pleaded guilty, in a separate case, to the murder of Ta'naja. She testified that in February 2019 she was a stay-at-home mother and that Myers was periodically employed in lawn care—work that he did more in the spring and the summer than in the winter. At first in her testimony, Davis represented that Myers had helped with the care of Anthony Jr. but not with the care of Ta'naja. Later in her testimony, however, Davis admitted that in the winter of 2018 and 2019 she was suffering from depression and that, consequently, it was primarily Myers who took care of Ta'naja during those winter months. (Detective Wrigley testified that, according to Davis's statement to him, Myers helped take care of both children when he came home.)

¶ 29    The prosecutor asked Davis:

"Q. And you both cooperated with DCFS, correct?

A. Yes.

Q. And did [Myers] accept Ta'naja as his own daughter?

A. Yes.

Q. Did he represent to DCFS that he would care for her as his own daughter?

A. Yes."

¶ 30    Davis testified that it was Myers who had paid the heat and water bills and had bought groceries for the household. She insisted that in the winter of 2019 she and Myers had food to eat and that Anthony Jr. was healthy and well-fed—so well-fed, in fact, that other people called Anthony Jr. "Chunky Baby." They were not food-deprived, Davis testified, but, even so, some severe money-saving measures were deemed necessary. To keep down the electricity bill, the

lights in the house were shut off unless Davis or Myers were cooking or eating. (A neighbor of Myers and Davis, Eric Hutchinson, testified that one night in the fall of 2018 he allowed Myers to borrow his phone, and he heard Myers order Davis on the phone, " 'Bitch, please turn out my lights.' " Hutchinson then saw the lights in Myers and Davis's house wink off.) Likewise, to keep down the gas bill, the furnace was shut off at night.

¶ 31 A plumbing problem curtailed the water consumption. Davis testified that because the line supplying water to the house was ruptured, the water was turned off. So, in February 2019, when Ta'naja died, the house lacked running water. Whenever water was needed, someone had to go down into the basement, turn on the water main long enough to fill up a bucket, and then carry the bucket upstairs.

¶ 32 According to Davis's testimony, she turned off the furnace at 5 p.m. on February 10, 2019, and Myers knew that she had done so. While the furnace was off, there was no other heat source in the house that night other than two space heaters. Ta'naja was alone in her bedroom, dressed only in a T-shirt. Typically, one of the space heaters was kept in Ta'naja's bedroom, Davis testified, but on February 10, 2019, that space heater was moved from Ta'naja's bedroom and into the bedroom that Myers, Davis, and Anthony Jr. occupied. Thus, the night of February 10, 2019, during which the furnace was off, both space heaters ended up in Myers's and Davis's bedroom, and no space heater was in Ta'naja's bedroom. In the trial, Davis claimed to be unable to remember who had removed the space heater from Ta'naja's bedroom.

¶ 33 The prosecutor questioned Davis about a telephone conversation she had with Barnes on July 6, 2020:

- 11 -

"Q. Isn't it true that [Barnes] said to you, [']*What really happened to our daughter?*['] And you responded that ['*Myers*] *shut the heat off and he removed the space heater from the room.*[']

A. That might have been what I said. I don't know.

Q. And did you, in fact, say that three times to Dartavious Barnes?

A. Yeah.

Q. I did not hear that.

A. Yeah.

Q. Okay. Just to clarify, on July the 6th of 2020, you said three times to Dartavious Barnes that [Myers] shut the heat off and he removed the space heater, and that was after [Barnes] said, [']*What really happened to our daughter?*['] Is that accurate?

* * *

A. Yes.

Q. The night that Ta'naja died, how many space heaters did you have in the house?

A. Two.

Q. And was one black and was the other gray?

A. Yes.

Q. Which one was usually in Ta'naja's room?

A. The black one.

Q. And which one was usually—or where was the other one? Where was the gray one usually?

A. In our room.

Q. When you say 'our room,' you mean your room with [Myers]?

A. Yeah.

Q. On February the 10th of 2019, how many of those space heaters functioned properly?

A. One.

Q. And which was the one that functioned properly?

A. The black one.

Q. And that was the one that was usually in Ta'naja's room?

A. Yeah.

Q. The night that Ta'naja died, that black space heater was at the foot of your bed, correct?

A. Yeah.

Q. And was that the first night that Ta'naja did not have that space heater?

A. Yes.

Q. And as you slept that night in bed, you were sleeping with [Myers], correct?

A. Yes." (Emphases in original.)

¶ 34    According to the testimony of Robert Maynard, an investigator with the Macon County state's attorney's office, Davis told him and an assistant state's attorney that Myers had removed the space heater but that, for two reasons, Davis did not want Myers to get in trouble. First, she did not think that Myers had intended to harm Ta'naja. Second, Myers's mother had been pressuring Davis not to implicate her son, for if he were acquitted, he would regain custody of

- 13 -

Anthony Jr. and Davis's other daughter—or so Myers's mother assured Davis. Davis admitted that she was still in love with Myers. She believed that, if acquitted, Myers would indeed obtain custody of Anthony Jr. and their daughter.

¶ 35        In Davis's trial account of what happened, no one but her entered Ta'naja's bedroom from the morning of February 10, 2019, to the morning of February 11, 2019, when she found that Ta'naja had died on the floor. In Davis's testimony, there was no mention of Myers's entering the bedroom the night of February 10, 2019, to remove the space heater. Davis recounted that on February 10, 2019, she woke up at 4 a.m. and fed Anthony Jr. pork steak, corn, and "alfredo." Then, at 7 a.m., she checked on Ta'naja, who was lying down, and she gave her noodles. Around 10 a.m., Ta'naja was still lying down, and Davis gave her more noodles and a hot dog. Myers returned home around 4 p.m. and made rice and beans, which Davis took to Ta'naja, who was still lying down. At that time, according to Davis's testimony, she also gave Ta'naja some water to drink, using an empty soda bottle as a water container. Davis checked on Ta'naja again at 7 p.m., and she was still lying on the bedroom floor.

¶ 36        Davis testified that Ta'naja had been in her bedroom all day. Davis was asked:

"Q. And on that day—so that would have been Sunday, February 10th, had she been in her room all day?

A. She came out of her room the day before and then she went back in her room and was in there all day again.

Q. Was it her choice to go in her room on February 10th or did someone put her in her room?

A. She got put in her room.

Q. And who put her in her room?

A. I did.

Q. Why did you do that?

A. Because she was acting up.

Q. What was she doing that would be considered acting up?

A. Like, not taking a nap or not doing what she was told to do.

Q. So she was put in her room on February the 10th of 2019 as a punishment, correct?

A. Yes.

Q. Did you tell her you can come out in the morning?

A. Yes."

Davis admitted, however, that, Ta'naja was unable to leave the bedroom. Although the bedroom door was unlocked, Ta'naja was physically unable to open the door.

¶ 37　　　With Ta'naja still effectively confined to her bedroom, Davis went to bed, by her account, around 8:30 p.m. on February 11, 2019. Both space heaters were in her bedroom. She testified, however, that the space heater that had been taken from Ta'naja's bedroom did not work anyway and would not have kept Ta'naja warm. (Moments before, Davis had testified that this space heater was the only one that "functioned properly.") Around 6 a.m. on February 11, 2019, Davis heard a noise from Ta'naja's bedroom as if someone were talking. She did not get up and check on Ta'naja at that time. When Davis brought Ta'naja breakfast later that morning, she found her naked, cold, and unresponsive on the bedroom floor. Ta'naja had removed her T-shirt before she died. (According to the testimony of Dr. Denton, victims of hypothermia become so cold that, sometimes, their body is fooled into thinking it is overheated. Under the delusion that they need to cool off, they remove their clothing.)

¶ 38 On cross-examination by the defense, Davis testified that it had been her role to take care of the children and the home whereas it had been Myers's role to make money to support the household. After DCFS became involved with the children, Myers did not do much to take care of Ta'naja, according to Davis's testimony, because he had been accused of "doing stuff" to Ta'naja and he was worried that if he acted as her primary caretaker, he would be accused again.

¶ 39 Nevertheless, Davis admitted, Myers would cook for the family, would take Ta'naja food sometimes, and would help with Anthony Jr. Also, Davis admitted telling her mother and Barnes that, in the days leading up to Ta'naja's death, Davis was having mental health problems that prevented her from performing her responsibilities as a mother. Davis claimed, however, that, until the morning when she was found dead, Ta'naja had been acting normally. Davis denied that Ta'naja had looked sick.

¶ 40 On redirect examination, there was the following exchange between the prosecutor and Davis:

"Q. [Defense counsel] asked you if Ta'naja appeared to be sick during the time leading up to her death and you said no. Do you remember that question and that answer?

A. Yes.

Q. Going back to the *** phone call with Dartavious Barnes where you called your mom and he was at your mom's house and then he got on the phone, do you remember saying to Dartavious, 'We knew something was wrong because she didn't ever eat. She stayed up all night and she always just would stand by the window and look out the window.' Did you say that to Dartavious?

A. Yeah.

Q. And is that what was happening in the time leading up to Ta'naja's death?

A. Sometimes."

¶ 41    Davis further testified, on redirection examination, that (1) whenever she was depressed, she had difficulty taking care of the children, including feeding them, and (2) she had been depressed every day for the entire year preceding Ta'naja's death. The prosecutor asked Davis:

"Q. And [Myers] saw you every day, didn't he?

A. Yeah.

Q. So he knew you weren't taking care of the kids, didn't he?

A. He didn't know because he wasn't always there.

Q. He was there. He lived there, didn't he?

A. Yeah.

* * *

Q. And you weren't even taking care of Anthony, Jr., correct?

A. Right.

Q. So Anthony, Jr., was a big baby because [Myers] took over for him because you couldn't do it. Would that be a fair statement?

A. Yeah.

Q. Because you were not the one feeding Anthony, Jr., in the winter of 2019, right? It was [Myers]?

A. No. I got up and made meals sometimes.

Q. But not regularly; would that be a fair statement?

A. Like, every couple of days.

Q. So you were making meals every couple of days?

A. Yeah.

Q. So when you did not make meals—on the days that you did not make meals, who was feeding Ta'naja?

A. She still ate.

Q. Who fed her?

A. He did.

Q. [Myers]?

A. Yeah.

Q. In her bedroom?

A. Yeah.

Q. That she couldn't get out of, correct?

A. Yeah.

Q. So in the months leading up to her death, [Myers] was equally responsible for the food that she ate, as you were, if you're feeding her every couple of days. Would that be fair?

A. Yeah.

Q. So you guys were sharing the burden of feeding Ta'naja and making sure that she was nourished, right?

A. Yeah.

Q. And that would go for whatever water she would drink, too?

A. Yeah.

"Q. And when you would give her water, whoever gave her the water, they'd have to go to the basement and turn the water main on, right?

A. Yeah.

Q. So every—on the days where you were struggling with depression and couldn't take care of the kids, it would have been [Myers]'s responsibility to go down to the basement, turn the water main on, give her—bring water to her, right?

A. Yeah."

¶ 42    The jury found Myers guilty of the knowing first degree murder of Ta'naja. See 720 ILCS 5/9-1(a)(2) (West 2018). The jury found it to be unproven, however, that the murder had resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty. (The jury instructions directed that if the jury found Myers guilty of the murder charge, the jury was not to fill out the verdict forms pertaining to the remaining charge of endangering the life or health of a child. So, there was only the guilty verdict on the murder charge.)

¶ 43    The circuit court sentenced Myers to imprisonment for 30 years.

¶ 44    This appeal followed.

¶ 45                                    II. ANALYSIS

¶ 46        A. The *Mens Rea* for Knowing First Degree Murder Compared to

                the *Mens Rea* for Endangering the Life or Health of a Child

¶ 47    Myers requests that, on the ground of the insufficiency of the evidence, we reverse his conviction of knowing first-degree murder (720 ILCS 5/9-1(a)(2) (West 2018)). In his view, no rational trier of fact could find, beyond a reasonable doubt, that he had the *mens rea*, or guilty state of mind, required to commit knowing first degree murder, namely, knowledge that his "acts created a strong probability of death or great bodily harm to" Ta'naja. *Id.* Myers concedes,

- 19 -

however, that the evidence was sufficient to convict him of the lesser offense with which he also was charged, the offense of endangering the life or health of a child (*id.* § 12C-5(a)(1)). Accordingly, he requests that a conviction of count II, endangering the life or health of a child, be substituted for the conviction of count I, knowing first degree murder.

¶ 48    "A person commits endangering the life or health of a child when he or she knowingly *** causes or permits the life or health of a child under the age of 18 to be endangered." *Id.* The supreme court has interpreted the term "endanger" as meaning " 'to bring into danger or peril of *probable* harm.' " (Emphasis added.) *People v. Collins*, 214 Ill. 2d 206, 214 (2005) (quoting Webster's Third New International Dictionary 748 (1996)); see also *People v. Wilkenson*, 262 Ill. App. 3d 869, 874 (1994). Probable harm is more than a mere possibility of harm. Granted, the supreme court in *Collins* also says that the term "endanger" "refers to a potential or possibility of injury." *Collins*, 214 Ill. 2d at 215. By "potential" or "possibility," however, the supreme court means a probability of injury: a possibility that is great enough that society deems the running of the risk to be irresponsible. See *id.* at 214. To illustrate the distinction we are making here, it is *possible* that allowing a child to play in the backyard would result in the child's being struck by lightning or by a falling tree branch. Even so, by allowing the child to play in the backyard, the parent would not be guilty of endangering the life or health of a child, for the child would not be *apt* to be struck by lightning or by a falling tree branch. Endangering the life or health of a child entails the defendant's knowledge of an irresponsibly high likelihood, not merely a possibility, of the child's coming to harm.

¶ 49    Thus, by requesting us to substitute a conviction of endangering the life or health of a child for the conviction of knowing first degree murder, Myers admits that the evidence was sufficient to prove he had the guilty state of mind required for endangering the life or health of a

- 20 -

child: knowledge that his acts created a *probability* of *harm* to Ta'naja. See *id.* According to him, however, the evidence was insufficient to prove his knowledge that his "acts create[d] a *strong probability* of *death or great bodily harm.*" (Emphases added.) 720 ILCS 5/9-1(a)(2) (West 2018).

¶ 50    Taking as a given, then, Myers's knowledge that Ta'naja was in "peril of probable harm" from cold exposure, malnutrition, and dehydration (*Collins*, 214 Ill. 2d at 214), the question is as follows. When all of the evidence is regarded in a light most favorable to the prosecution and when all reasonable inferences are drawn in favor of the prosecution, could any rational trier of fact find, beyond a reasonable doubt, Myers's knowledge that cold exposure, malnutrition, and dehydration "created a strong probability of death or great bodily harm" to Ta'naja (720 ILCS 5/9-1(a)(2) (West 2018))? See *Collins*, 214 Ill. 2d at 217. This appeal comes down to a mere difference between a probability of harm and a strong probability of death or great bodily harm.

¶ 51    B. *Pollard*

¶ 52    The only reported Illinois decision we could find that has facts somewhat comparable to those in the present case is *People v. Pollard*, 2015 IL App (3d) 130467. In *Pollard*, the defendant, at age 18, gave birth to a son. *Id.* ¶ 5. Because the child was premature, he required special care. *Id.* Hospital staff members instructed the defendant that the child was to be kept on a heart and apnea monitor at all times except when the child was bathed and that if the alarm on the monitor sounded and if the defendant was unable to resolve the problem immediately, she was to call 911. *Id.* ¶ 7. Also, hospital staff members instructed the defendant that the child was to be fed a bottle of formula every three hours, around the clock, without fail, and that if the child were asleep when it was time for another feeding, the child was to be awakened and fed. *Id.* ¶ 8.

¶ 53    When the child was in the defendant's care, his health deteriorated. *Id.* ¶ 11. Friends and relatives repeatedly had to remind the defendant to go check on him. *Id.* ¶¶ 11, 14. Two days

- 21 -

before the child died, the alarm on the heart monitor kept sounding. *Id.* ¶ 12. The seventh time the alarm sounded, the defendant shut off the monitor. *Id.* She turned the monitor back on two hours later. *Id.* In the morning of the day when the child died, the alarm on the heart monitor sounded 10 times before the defendant woke up, turned off the monitor, and went back to sleep. *Id.* ¶ 14. Around noon, the alarm sounded again. *Id.* This time, the child was blue and not breathing, with both fists clenched. *Id.* Resuscitation efforts were unsuccessful, and in the hospital, the child was declared dead. *Id.* According to the autopsy, he "had died from dehydration and malnourishment due to neglect, with [the] prematurity [of his birth] being a contributing factor." *Id.* ¶ 15. The alarm on the heart monitor had sounded, a forensic pathologist explained, because dehydration had driven up the child's heart rate. *Id.* ¶ 16.

¶ 54    Charges were brought against the defendant in *Pollard*, and there was a bench trial. *Id.* ¶ 1. Count I charged her with knowing first degree murder (720 ILCS 5/9-1(a)(2) (West 2010)) in that she had failed to provide the child adequate nutrition and hydration. *Id.* ¶¶ 1, 3. As to count I, the circuit court found the defendant guilty of the lesser included offense of involuntary manslaughter (720 ILCS 5/9-3(a) (West 2010)). *Id.* ¶ 21. In so finding, the court explained that "it could not find that the withholding of food and water, under the totality of the evidence, was done with knowledge by [the] defendant of a strong probability of death." *Id.* Count II, another count of knowing first degree murder, alleged that the defendant had committed that offense not only by withholding adequate nutrition and hydration but also by ignoring the heart monitor. *Id.* ¶ 3. The court found the defendant to be guilty of count II "because there was a high probability that death or great bodily harm would result to a premature infant *** under those circumstances." *Id.* ¶ 21.

¶ 55    The defendant in *Pollard* appealed the conviction on count II, the knowing first degree murder conviction, claiming that the State had failed to prove, beyond a reasonable

doubt, her alleged knowledge that her conduct created a strong probability of death or great bodily harm to the child. *Id.* ¶ 1. A majority of the Third District panel rejected this claim, finding as follows:

> "When we view the evidence in the light most favorable to the State and consider that [the] defendant was told at the hospital that [the child] had to be fed every three hours and that the heart and apnea monitor was not to be turned off unless she was giving [the child] a bath, we find that the evidence was sufficient to establish that [the] defendant acted with 'knowledge' that her acts created a strong probability of death or great bodily harm to [the child]." *Id.* ¶ 28.

That the defendant "had only borderline intelligence" and that the circuit court had found, as to count I, only a reckless state of mind instead of knowledge did not "persuade[ ]" the majority "to reach a conclusion to the contrary." *Id.* ¶ 29.

¶ 56        Justice McDade dissented. In her view, "[t]here [was] a dearth of evidence—circumstantial or otherwise—in the record to suggest that the defendant was 'consciously aware' that [the child's] death was 'practically certain to be caused by [her] conduct' (720 ILCS 5/4-5(b) (West 2010))." *Id.* ¶ 40 (McDade, J., dissenting). The statute from which Justice McDade quoted in this context, section 4-5(b) of the Criminal Code of 1961 (720 ILCS 5/4-5(b) (West 2010)), was a description of when a person acted with knowledge. The statute provided as follows:

> "A person knows, or acts knowingly or with knowledge of:
>
> ***
>
> > (b) The result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is

- 23 -

practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2010).

(Incidentally, the jury instructions in the present case did not include this statutory definition of "knowledge.") Applying section 4-5(b), Justice McDade reasoned that the defendant in *Pollard* was guilty of knowing first-degree murder (*id.* § 9-1(a)(2)) only if the State proved, beyond a reasonable doubt, the defendant's "conscious[ ] aware[ness]" that "[t]he result of *** her conduct," namely, the child's death, was "practically certain to be caused by [her] conduct." *Id.* § 4-5(b). In Justice McDade's opinion, no reasonable trier of fact could have found that the State had carried that burden of proof, that is, the burden of proving the defendant's knowledge that depriving the child of nutrition and hydration and turning off the heart monitor were practically certain to cause the child's death. See *Pollard*, 2015 IL App (3d) 130467, ¶ 40 (McDade, J., dissenting).

¶ 57          But we would respectfully suggest that, in the *mens rea* analysis in *Pollard*, the child's death was not the relevant result that the defendant had to know. To have committed knowing first degree murder, the result that the defendant had to know would follow from her conduct was not the child's death (a knowledge required for intentional first degree murder (720 ILCS 5/9-1(a)(1) (West 2010)) but, rather, "a strong probability of death or great bodily harm" to the child. *Id.* § 9-1(a)(2).

¶ 58          Perhaps this distinction will come into clearer focus if we quote the definition of intentional first degree murder (*id.* § 9-1(a)(1)) alongside the definition of knowing first degree murder (*id.* § 9-1(a)(2)):

                    "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

- 24 -

(1) he either intends to kill or do great bodily harm to that individual or another, *or knows that such acts will cause death* to that individual or another; or

(2) he *knows that such acts create a strong probability of death or great bodily harm* to that individual or another." (Emphases added.) *Id.* § 9-1(a)(1), (2).

To be sure, regardless of whether the murder is intentional (*id.* § 9-1(a)(1)) or knowing (*id.* § 9-1(a)(2)), the murder statute requires a "death" "cause[d]" by—which is to say resulting from— the defendant's "acts." *Id.* § 9-1(a); see also *People v. Nelson*, 2020 IL App (1st) 151960, ¶¶ 49-52. Unlike a perpetrator of intentional first degree murder (720 ILCS 5/9-1(a)(1) (West 2010)), however, a perpetrator of knowing first degree murder (*id.* § 9-1(a)(2)) need not know that death "is practically certain to be caused by his conduct" (*id.* § 4-5(b)). Instead, a perpetrator of knowing first degree murder must know merely that "a strong probability of death or great bodily harm" (*id.* § 9-1(a)(2)) "is practically certain to be caused" (or as section 9-1(a)(2) says, to be "create[d]") "by his [or her] conduct" (*id.* § 4-5(b)).

¶ 59    There is a difference between being "practically certain" of a "strong probability" that something will happen and being "practically certain" that something will happen. " 'Strong probability' " is in between the greater assuredness of " 'practical certainty' " and the lesser assuredness of " 'likely cause' " or " 'substantial and unjustifiable risk.' " *People v. Davis*, 35 Ill. 2d 55, 60 (1966) (quoting S.H.A., chap. 38, § 9-1, Committee Comments); see also *People v. Axtell*, 2017 IL App (2d) 150518, ¶ 62. Justice McDade dissented in *Pollard* because she expected the State to prove this higher assuredness of practical certainty: that the defendant, with her intellectual capacity of an eight- or nine-year-old, was practically certain that the child would die

as a result of her parental derelictions of duty. See *Pollard*, 2015 IL App (3d) 130467, ¶ 41 (McDade, J., dissenting). The State would have had that burden, however, only if it had charged the defendant with intentional first degree murder. If the State had so charged, it would have had to prove either intentionality or "know[ledge] that such acts [would] cause death" (720 ILCS 5/9-1(a)(1) (West 2010)). In other words, to substitute the definitional language from section 4-5(b) (*id.* § 4-5(b)), the State would have had to prove, if not intentionality, then the defendant's "conscious[ ] aware[ness] that" death "[was] practically certain to be caused by [her] conduct"— a level of awareness that would have been tantamount to intentionality. But the State did not charge the defendant in *Pollard* with intentional first degree murder (*id.* § 9-1(a)(1)). Instead, the State charged her with knowing first degree murder (*id.* § 9-1(a)(2)). Therefore, the State had to prove that the defendant in *Pollard* was "consciously aware" (*id.* § 4-5(b)) that a "strong probability of death or great bodily harm" to the child (*id.* § 9-1(a)(2)) was "practically certain to be caused by [the defendant's] conduct" (*id.* § 4-5(b)).

¶ 60      In the present case, Myers admits his knowledge, his conscious awareness, that his conduct of exposing Ta'naja to malnutrition, dehydration, and cold endangered her. Such an admission is inherent in his request that we substitute a conviction of count II, endangering the life or health of a child (*id.* § 12C-5(a)(1), (d)), for his conviction of count I, knowing first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)). Thus, he merely disputes that he was consciously aware of the degree and gravity of the risk to Ta'naja. When we view all of the evidence in a light most favorable to the prosecution, we are unable to say it would be impossible for "*any* rational trier of fact" to infer, beyond a reasonable doubt, Myers's knowledge that subjecting Ta'naja to starvation, dehydration, and freezing temperatures created a substantial probability that she would suffer death or great bodily harm (see *id.* § 9-1(a)(2)). (Emphasis in original.) *People v. Collins*,

106 Ill. 2d 237, 261 (1985). Arguably, for two reasons, the evidence of guilty knowledge is stronger in this case than in *Pollard*: (1) unlike the defendant in *Pollard*, Myers suffered from no intellectual limitation and (2) unlike the child in *Pollard*, Ta'naja had numerous nonaccidental injuries on her body, which were suggestive of malice toward her—malice in the infliction of the injuries and malice in their toleration.

¶ 61                    C. Myers's Contrast of Himself to the Defendant in *Banks*

¶ 62          In an effort to demonstrate the insufficiency of the murder evidence against him, Myers draws a contrast between himself and the defendant in *People v. Banks*, 161 Ill. 2d 119 (1994)—a defendant who, the supreme court held, was rightfully found guilty of starving to death, and freezing to death, a child in his household who was unrelated to him. In *Banks*, a jury found Randy Banks guilty of the intentional first degree murder (Ill. Rev. Stat. 1985, ch. 38, ¶ 9-1(a)(1)) of his live-in girlfriend's 16-month-old daughter. *Banks*, 161 Ill. 2d at 123. The child had died of hypothermia and starvation. *Id.* at 127-28. On appeal, Banks argued that because the victim was not his biological child and because he therefore had owed no duty to protect her, the evidence was insufficient to convict him of murdering her by supposedly neglectful omissions to act. *Id.* at 132-33.

¶ 63          The supreme court in *Banks* did not read the indictment, however, as charging Banks merely with omissions or failures to act. *Id.* at 133. Nor had the State "attempt[ed] to prove that [Banks] failed to protect the victim from harm, as [he] claim[ed]." *Id.* Instead, the State had presented evidence that, by his affirmative actions, Banks "caused the victim's death by starvation and profound hypothermia." *Id.* For example, Banks snatched the bottle away from the mother as she was feeding the victim. *Id.* He required the door of the bedroom to remain closed in which the victim lay naked, immobilized by malnutrition, thereby preventing heat from the space heater in

the living room from entering the bedroom. *Id.* at 134. He beat the mother whenever she tried to sneak food to the victim. *Id.* at 135. He threatened the mother with death if she tried to take the victim to a doctor. *Id.* By contrast, in the present case, Myers argues, the only evidence of an affirmative act by him was his alleged removal of the space heater from Ta'naja's bedroom the night before she froze to death—and, according to Myers, it is unclear from the evidence whether it was he or Davis who removed the space heater.

¶ 64    When the evidence is viewed in the light most favorable to the prosecution, a rational trier of fact could find that it was Myers who removed the space heater from Ta'naja's bedroom the cold winter night when the temperature outside dipped down to around 19 degrees. See *Collins*, 106 Ill. 2d at 261. Arguably, that affirmative act by Myers is not so very different from Banks's affirmative act of closing the bedroom door so as to prevent heat from the living room from reaching the victim in the bedroom. See *Banks*, 161 Ill. 2d at 134. Arguably, in the present case, as in *Banks*, the victim's death by hypothermia was the proximate result of an affirmative act by the defendant.

¶ 65    In any event, just because the defendant in *Banks* was convicted of *intentional* first degree murder on the basis of his affirmative acts, it does not follow that causing someone's death by omitting to act necessarily falls outside the *knowing* first degree murder statute. It is true that section 9-1(a)(2) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/9-1(a)(2) (West 2018)) speaks of "acts" causing the death. "A person who kills an individual without lawful justification commits first degree murder if, in performing the *acts* which cause the death[,] *** he knows that such *acts* create a strong probability of death or great bodily harm to that individual or another." (Emphases added.) *Id.* In the Criminal Code, however, the word "act" is a specially defined term. As the circuit court instructed the jury, the term " '[a]ct' includes a failure or

- 28 -

omission to take action." 720 ILCS 5/2-2 (West 2018). "Failure" means "a failing to perform a duty or expected action." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/failure (last visited Mar. 1, 2022). A synonym of "fail" is "neglect." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/fail (last visited Mar. 1, 2022). If the relationship between the defendant and the victim was such that the defendant had a duty to act so as to protect the victim from harm and if the victim died as a result of the defendant's failure to perform that duty, the defendant—provided that he or she had the intentional or knowing state of mind alleged by the State (see 720 ILCS 5/9-1(a)(1), (2) (West 2018))—could be found guilty of murder. See *People v. Stanciel*, 153 Ill. 2d 218, 236 (1992).

¶ 66 Granted, it has long been the rule in Illinois that, by the mere fact of marrying a person, one does not assume responsibility to support, *e.g.*, feed and protect, the children that the person had by someone else. *Mowbry v. Mowbry*, 64 Ill. 383, 387 (1872). But there is a significant caveat to that rule. If the stepparent (or non-father or non-mother) "so receive[s] [the stepchildren] and treat[s] them as to raise the presumption that he [or she] intends to create the relation of parent and child," that relationship, so assumed, is binding on the stepparent "so long as [the relationship] continues." *Id.*; see also *Faber v. Industrial Comm'n*, 352 Ill. 115, 119-20 (1933); *Brush v. Blanchard*, 18 Ill. 46, 47 (1856); *Phillips v. Dodds*, 371 Ill. App. 3d 549, 552 (2007); 29 Ill. L. and Prac. *Parent and Child*, § 12 (2022). In short, "[a] person *in loco parentis* stands in the place of a parent and assumes the rights, duties, and obligations of a parent." *Maurissa J. B. v. Ingrida K.*, 2019 IL App (2d) 190107, ¶ 42. The circuit court instructed the jury, "A parent or a person standing in loco parentis has a duty to care for his child. The term in loco parentis means a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation."

¶ 67    As the supreme court has observed, "[a] showing of in loco parentis *** has come to require that the putative parent (1) intended to assume parental functions and (2) discharged parental duties." *Mid-American Lines, Inc. v. Industrial Comm'n*, 82 Ill. 2d 47, 52 (1980). A reasonable trier of fact could find that, with respect to Ta'naja, Myers met those two elements of *in loco parentis* status. Caseworkers testified that, during supervised visitations, Myers treated Ta'naja as if he were her father. To quote Myers's summary of Beasley-Ricks's testimony, when the child-neglect case was closed on October 24, 2018, "Myers had complied with all services, assumed a parental role with [Ta'naja], and agreed to care for her." To further quote from Myers's brief, defense counsel, in his closing argument, acknowledged to the jury that Myers "accepted his role as [Ta'naja's] surrogate parent." Therefore, a reasonable trier of fact could find that, as someone standing *in loco parentis* (Latin for "in the place of a parent") with respect to Ta'naja, Myers had a duty to take care of her and to protect her from harm, including harm from cold, hunger, and thirst. "Although the law does not generally require an individual to come to the aid of another, certain relationships exist which require such action. Criminal conduct may arise not only by overt acts, but by an omission to act where there is a legal duty to do so." *Stanciel*, 153 Ill. 2d at 236. On pain of possible criminal liability for murder, parents—and those standing *in loco parentis* (see *Maurissa J. B.*, 2019 IL App (2d) 190107, ¶ 42)—must take action to protect the children in their care against "the threatened perils of nature (e.g., to combat sickness, to ward off starvation or the elements)." (Internal quotation marks omitted.) *Stanciel*, 153 Ill. 2d at 236.

¶ 68    Thus, even if, as Myers argues, he is not as bad as the defendant in *Banks* in that Myers did not snatch the food out of Ta'naja's mouth or throw open the window to Ta'naja's bedroom on a cold winter day, Myers nevertheless could commit knowing first degree murder by failing to take action to protect Ta'naja from starvation, dehydration, and hypothermia. An "act,"

within the meaning of the knowing first degree murder statute (720 ILCS 5/9-1(a)(2) (West 2018)), includes an omission to act when there is a duty to act (see *id.* § 2-2). So, even if it were Davis instead of Myers who removed the space heater from Ta'naja's bedroom and placed it in Davis's and Myers's bedroom, at the foot of their bed, that fact would not necessarily save Myers from criminal liability for murder. As someone who had chosen to stand *in loco parentis* to Ta'naja, Myers could commit a knowing first degree murder of her by failing to act—such as by failing to turn on the furnace, failing to move the space heater back into her bedroom, failing to make sure she had adequate blankets and clothing to protect her against freezing temperatures, and failing to make sure that she received enough food and water. See *id.*; *Stanciel*, 153 Ill. 2d at 236; *Maurissa J. B.*, 2019 IL App (2d) 190107, ¶ 42.

¶ 69                  C. A Reasonable Inference of Guilty Knowledge

¶ 70          It is commonly known that malnutrition, if it is severe enough, can of itself cause the organs of the body to shut down. But it also is commonly known that malnutrition makes the body more vulnerable to environmental stressors such as disease and cold. The hypothermia that was the immediate cause of Ta'naja's death cannot be artificially abstracted from the starvation and dehydration leading up to the hypothermia. Arguably, common sense would have suggested to Myers that an underfed, dehydrated, physically compromised child such as Ta'naja, who was so frail that she could not even turn a doorknob, was especially vulnerable to the challenges of her environment.

¶ 71          According to Myers, though, the State failed to prove, beyond a reasonable doubt, his knowledge that Ta'naja was starving. He gives two reasons why, in his view, the State failed to carry its burden of proof on this point.

¶ 72    First, Ta'naja was fed shortly before she died. In his autopsy, Dr. Denton found about three teaspoons of noodles in her stomach. Davis testified that on February 10, 2019, Myers made rice and beans for Ta'naja. And, indeed, on February 11, 2019, the police found rice and beans on a tray in her bedroom. Even so, a parent can knowingly starve a child by feeding the child a little but not enough.

¶ 73    Second, Myers argues that "[Ta'naja's] weight at the time of her death," 21 pounds, "failed to support an inference that [he] should have known [she] was malnourished to the extent she was likely to suffer great bodily harm from one evening of cold exposure." Myers notes that "[w]hile [Ta'naja] weighed about 25 pounds in July of 2018, prior to returning to Davis and Myers's home, the medical evidence showed that she was healthy when she weighed only 22 pounds in January and April 2018, when she did not live with them." True, but at 2 years and 10 months of age, Ta'naja should have weighed more, not less, than what she weighed 10 to 13 months ago. Myers knew how to keep a child adequately fed: his biological son, Anthony Jr., was proof.

¶ 74    Raw weight numbers aside, the jurors could have credited Davis's admission to Ta'naja's father that " '[w]e' "—meaning she and Myers—"knew something was wrong because she didn't ever eat' " and that Ta'naja " 'just would stand by the window and look out the window.' " According to Dr. Denton's testimony, Ta'naja had not had much to eat in a long time, "at least several weeks to *** possibly a month," and she would have been fading away, *i.e.*, spending all her time gazing listlessly out the window or lying on the bedroom floor. That this state of affairs escaped Myers's attention could have struck the jury as implausible. The jury could have reasonably inferred Myers's knowledge that (1) Ta'naja was malnourished and thinly clad with little or nothing in the way of bedclothes; (2) with the furnace turned off, her bedroom would

- 32 -

become extremely cold when Myers or Davis (it little matters who) removed its only heat source, the space heater; and (3) in her frail condition, with almost no protection against the cold, Ta'naja faced a substantial probability of death or great bodily injury. Also, as we already have mentioned, the malice that is evident in the many nonaccidental injuries on Ta'naja's body increases the reasonableness of such a finding of guilty knowledge.

¶ 75                                III. CONCLUSION

¶ 76         In sum, when all of the evidence is viewed in a light most favorable to the prosecution, a rational jury could find, beyond a reasonable doubt, that Myers had the *mens rea* necessary for the commission of knowing first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)), namely, knowledge that his acts of subjecting Ta'naja to extreme cold, malnourishment, and dehydration created a substantial possibility that she would suffer, as a consequence, death or great bodily injury. Therefore, we affirm the circuit court's judgment.

¶ 77         Affirmed.