(No. 73097.—
(No. 73184.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ELIJAH STANCIEL *et al.* (Violetta Burgos, Appellee).—THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. BARBARA PETERS, Appellant.

*Opinion filed November 19, 1992.*

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb, Randall Roberts, Loren A. Seidner and Maureen A. Harton, Assistant State's Attorneys, of counsel), for the People.

Rita A. Fry, Public Defender, of Chicago (James H. Reddy, of counsel), for appellee.

Walsh, Neville, Pappas & Mahoney, of Chicago (Matthew P. Walsh and J. Mark Lukanich, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb, Randall Roberts, Loren A. Seidner and Maureen A. Harton, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

At issue before us is the interpretation of criminal accountability as found in section 5—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 5—2(c)). Consolidated for purposes of appeal are the cases of Peo-

ple v. Elijah Stanciel and Violetta Burgos, No. 73097 (225 Ill. App. 3d 1082), and People v. Barbara Peters, No. 73184 (224 Ill. App. 3d 180). In the case of Violetta Burgos, the State appeals the judgment of the appellate court reversing the decision of the trial court, wherein the defendant was convicted for the murder of her daughter, Electicia Asbury, on the basis of her accountability for the murder by the principal, Elijah Stanciel. In the case of Barbara Peters, the defendant appeals the appellate court's judgment affirming the decision of the trial court, wherein she was convicted of the murder of her son, Bobby Peters, on the basis of her accountability for the murder by the principal, Kenneth Jacobsen. In the case of People v. Elijah Stanciel and Violetta Burgos, we reverse the judgment of the appellate court with respect to the conviction of Violetta Burgos. In the case of People v. Barbara Peters, we affirm the judgment of the appellate court.

## FACTS (Burgos)

Concerning the case of Violetta Burgos, Elijah Stanciel and Burgos were charged by indictment with murder, aggravated criminal sexual assault, and criminal sexual assault. In a bench trial, they were convicted of the murder of Burgos' child, Electicia Asbury. Burgos had lost custody of the child in 1984 after Electicia had suffered a broken leg in a child abuse case involving Stanciel. One of the conditions of her regaining the custody of the child was that she refrain from having any contact with Stanciel. Burgos, however, admitted that she continued her relationship with Stanciel, concealing that fact by living in separate residences. Burgos stated that she had let Stanciel assume the role of disciplinarian over the victim in March 1986.

On April 19, 1986, Electicia Asbury died as a result of multiple blunt force injuries. According to statements

made by both Stanciel and Burgos, in the morning hours of that day, Stanciel had spanked the girl because she had urinated on the floor. Later that day, after lunch, Electicia spit up on the floor. Stanciel then punched the three-year-old girl twice in the stomach because her buttocks were too raw. Later that afternoon, Electicia lost consciousness. Stanciel admitted biting the victim.

Burgos took the victim home, carrying the limp body, as the child could not walk. As Burgos carried Electicia up the stairs to their apartment, they fell. After Burgos' attempts to revive the little girl were unsuccessful, she contacted the paramedics. Electicia was taken to St. Francis Hospital, where she was pronounced dead that same day.

Detective Gildea testified for the State and related comments made to him by Stanciel. On many occasions, Stanciel administered punishment, including beatings with a belt, exercises and striking in various manners. Detective Gildea also testified to comments made to him by Burgos. Burgos stated that since March, Stanciel had taken over the disciplining of the child, and the punishment sometimes involved spanking (sometimes with a strap) and sometimes exercises, such as headstands.

A post-mortem examination conducted by forensic dentist Dr. John P. Kenney revealed that Burgos had also participated in abusing the victim. Dr. Kenney concluded that five bite marks found on the right cheek, right arm, right buttock and back of the victim were inflicted by Burgos. According to Dr. Kenney, these marks showed that the victim had been abused over a long period of time. Of the approximately 21 remaining bite marks, five others were inflicted by Stanciel.

Dr. Mitra Kalekar testified that she was deputy medical examiner for Cook County and that her field of expertise was forensic pathology. She stated the victim died as a result of multiple repeated blunt force injuries

to her body, which had been sustained over a period of time. At the time of her death, Electicia had a ruptured viscus and intestine, as well as injuries to her bowel and liver. She also had numerous blunt trauma injuries of lacerations, bruises, abrasions and scars about her head, face, body and limbs. These included lacerations to her left ear and chin, injuries in the vaginal area, a cluster of bruises on the right side of her forehead, and other multiple bruises throughout both arms, both legs, chest and abdominal areas, back and buttocks. She also had an area of a scalding burn on her lower leg. Dr. Kalekar noted that these wounds were in various stages of healing.

When questioned by the police concerning the numerous injuries to her daughter, Burgos related the account of the fall that had occurred on the stairs, but did not offer any other explanation. Burgos did not initially tell the police of her contact with Stanciel because of the Department of Children and Family Services prohibition on such contact. She later informed the police of her living arrangements with Stanciel and his role as disciplinarian.

## FACTS (Peters)

Concerning the case of People v. Barbara Peters, the facts show that on December 17, 1987, Barbara Peters' son, Bobby, died at the age of 20 months at LaGrange Memorial Hospital. He had been brought there by his mother and Kenneth Jacobsen, her boyfriend for six months. Bobby was not breathing at the time he was taken to the hospital, and efforts to resuscitate him were unsuccessful. An autopsy showed that he died as a result of bilateral subdural hematomas which resulted from blunt head trauma.

Peters and Jacobsen were charged in a 19-count indictment with the offenses of first degree murder, ag-

gravated battery to a child, cruelty to a child, and endangering the life or health of a child. Their cases were severed prior to trial.

A former baby-sitter, Karen Wagner, testified at trial for the State. She had begun baby-sitting for Bobby four or five times a week in April 1987. She first noticed problems with Bobby's physical condition in July 1987, a month after Peters had begun dating Jacobsen. At that time, she noticed a rash on Bobby which she described as "red, raw, dry and it was cracking." She obtained the name of a pediatrician through the child's father, and at his direction used ointment on the rash.

Later that month, again while baby-sitting, she noticed a bruise covering Bobby's entire buttocks. Wagner testified she questioned Peters about this, and the latter responded she thought Bobby had fallen at Wagner's home. Wagner testified that Bobby had never bruised himself to that extent any time he had fallen in her home.

In early August 1987, Wagner saw small bruises on Bobby's cheeks, chin, and forehead. She testified that Jacobsen told her Bobby had fallen off the ladder of a slide. She did not observe any dirt or blood on the child's clothes at the time. When Wagner told Peters what Jacobsen had said, the defendant did not respond. Later that August, after Jacobsen had brought Bobby to Wagner's house, she noticed four or five "bumpy-like welts" scattered around the center of his back. In response to Wagner's inquiry concerning the welts, Jacobsen responded that the child had fallen down an elevator shaft.

In September 1987, Bobby came to Wagner's house with a split on the inside and outside of his lower lip. Peters told Wagner that Bobby had fallen on the sidewalk. At this point, Jacobsen had moved in with Peters. Jacobsen would look after Bobby during the week, while Wagner looked after the child on the weekends.

In October 1987, Peters took Bobby to Wagner's home for a party, dressed in his pajamas. Upon attempting to remove Bobby's diaper, the child's leg stuck to the pajama. After removing the pajama, Wagner saw an oval-shaped burn which measured about two to three inches in diameter running across Bobby's calf. Wagner testified that the skin on Bobby's leg was "raw and pussy." When Wagner asked Peters how this had happened, Peters told her the burn was caused from Bobby's clothes rubbing on the back of his leg. Wagner testified that she had never noticed a similar such injury before this.

Later in October, in a telephone conversation with Wagner, Peters related that Bobby had to be taken to the hospital for burns to his back and neck. Her explanation for this was that Jacobsen had tripped over Bobby and spilled hot tea over him. Wagner testified that Peters told her they were going to arrest Jacobsen for child abuse and the hospital was going to press charges against him. Wagner saw Bobby the next day and described him as "walking stiff." He could not move his head from side to side, and when she removed his shirt, she saw that the burn went "from the top of his scalp down his neck and one shoulder," and "was very raw, very pussy, [and] his undershirt was stuck to it."

Wagner contacted the Department of Children and Family Services (DCFS) approximately a week later, on October 31, 1987, and told them of Bobby's burns and bruises. The following day, Peters called Wagner concerning the DCFS contact, informing her that she had an appointment for the next day. When Wagner later contacted her about the DCFS appointment, Peters refused to talk to her and cut off all contact between Wagner and Bobby.

Wagner did not see the boy again until late November 1987, when she ran into Peters at a bowling alley. Peters

allowed Wagner to take Bobby home for several hours, during which time Wagner inspected Bobby but found no fresh injuries. Wagner last saw the child on December 8, 1987, at the bowling alley. When Wagner asked to see Bobby for Christmas, Peters refused, saying Jacobsen did not want either Peters or Bobby to have anything to do with Wagner.

Bernadine Peters, Bobby's paternal grandmother, also testified for the State. She testified that she noticed no bruises on Bobby in her single visit with him in August 1987, or with her next visit with him in early September. However, she stated that in late September, while changing his diapers, he was very stiff and frightened, and she observed black and blue marks on Bobby's chest, ankles, and buttocks. She saw many bruises "about the size of a finger. And the butt was just almost completely covered *** [w]ith black and blue marks." In one other visit with Bobby in November 1987, she did not remember seeing any bruises.

Dr. Nancy Jones performed the autopsy on Bobby, and also testified as to the contents of his pediatric records. The parties stipulated to Dr. Jones' education, experience and board certification in the fields of anatomic, clinical, and forensic pathology. Dr. Jones testified that since July 1986, she had conducted 1,500 autopsies and over 200 of them had been performed on children under the age of two.

The salient portions of Dr. Jones' testimony show that Bobby was underdeveloped for his age, significantly shorter and underweight. The exterior of the boy's body exhibited a large number of bruises distributed over his head, trunk, and upper and lower extremities. The bruises varied in coloration, extending all along the right and left side of his face, both of his arms, both of his hands, his chest, the tops of his feet, on his back and on his buttocks. Dr. Jones explained that the depth of the

bruises can be measured by how far the bruise extends into the subcutaneous fat under the surface of the skin. The deeper the bruise goes into the subcutaneous fat, the greater the force which was used to cause the injury. Also, from the coloration of the bruise, it is possible to determine its age and the approximate time which had elapsed since the injury which resulted in the bruise.

The interior examination revealed a large area of hemorrhage, containing 16 grams of clotted blood, under the surface of Bobby's scalp on both the right and left side of Bobby's head. The brain was very swollen, a result of how the brain reacts to injury. There was also hemorrhaging in the abdominal cavity area and two additional hemorrhages in the tongue which were consistent with bite marks. In total, Dr. Jones' internal examination revealed 45 different areas of bruising on Bobby's body.

Dr. Jones concluded on the basis of the autopsy that Bobby had died as a result of bilateral subdural hematoma which resulted from blunt head trauma. She concluded that based upon the autopsy, the constellation of injuries, the varying ages of the injuries, and Bobby's pediatrician's records, Bobby's physical condition at the time of autopsy was "the direct result of on-going abuse." She stated that based upon the color of the bruises, some were at least a week old at the time of the boy's death, and that they would definitely have been visible on December 16, the day before Bobby died.

Dr. Jones found nothing in Bobby's records to indicate that he had any underlying illnesses or bleeding problems which would substantiate that Bobby was an "easy bruiser." She noted that some of the bruises went down into his subcutaneous tissue. Dr. Jones opined that the abuse dated back to approximately June 1987, when Bobby was 15 months of age. She indicated on Bobby's

death certificate that the injuries were intentional and not the result of accidental acts.

Investigator Baldwin, a detective with the Cook County sheriff's office, testified for the State regarding the conversation he had with Peters following Bobby's death. Peters told Baldwin she had been living with Jacobsen since September 1987, and would routinely leave Bobby in Jacobsen's custody when she worked. She stated she accepted Jacobsen's explanations to her for the bruises and injuries to Bobby in her absence, believing they were never very serious and she did not feel that the injuries warranted taking Bobby to the hospital. Peters explained to Baldwin that she had not taken Bobby to the hospital for his burns because Jacobsen had told her that he had gone to LaGrange Memorial Hospital and had obtained a jar of salve. Baldwin stated he had checked with the hospital and they had no record of this visit.

Baldwin stated that Peters told him she had last seen Bobby alive on December 16, 1987. Peters left home at 6:30 p.m. to go drinking with one of her girlfriends, and returned home three hours later. Jacobsen had put Bobby to bed and Peters did not look in on him that night. When Peters awoke on December 17, Jacobsen told her they had to take Bobby to the hospital because Bobby had turned blue.

Baldwin stated that when Peters was informed that Bobby's death was the result of a homicide, Peters just shrugged her shoulders and gave him a look as if it did not matter. Peters told Baldwin she had not really wanted the boy. When Baldwin asked her whether she did not really care what happened to Bobby, Peters responded, "I guess not." When Baldwin asked her how she thought Bobby died, Peters responded that she thought Jacobsen was responsible for his death.

However, Peters did tell Baldwin she loved Bobby and that she would never allow someone to abuse the boy or to deliberately hurt him.

Other witnesses for the State testified as follows. Linda Norcutt, the outpatient registrar at LaGrange Memorial Hospital, while working in the emergency room on the morning of December 17, 1987, overheard Peters say to Jacobsen, "I told you not to get so angry, I told you not to get so angry, I told [you] this would happen," and that Jacobsen responded, "Shush, shush, and go sit down." Susan Siorek, a registered nurse at LaGrange Memorial Hospital, testified as to the severity of Bobby's injuries at the time he was brought into the emergency room. Bobby was "very pale, very cold, very thin, and emaciated, unkept and he also was covered with bruises." She found bruises of varying colors, from yellowish-green to red-purplish, around the face and forehead, chest area, up and down both arms, the feet, down along the spinal column and on his buttocks.

The testimony of Dr. Carol Haller, an associate pathologist at Illinois Masonic Hospital and consultant for the Cook County medical examiner's office, was stipulated to by the State and defense. Dr. Haller would have testified that she had studied over 300 head injuries in children under the age of two, and, after examining Bobby, would have opined that in order to cause his injury, it would have taken a force equal to that received in a motor vehicle accident, or of being dropped from a height of approximately three stories. She stated that if Bobby's injury was caused by an object coming into contact with his head, it would have been something like a baseball bat, a heavy stick, or a club. In her opinion, the injury was not consistent with Jacobsen's explanation that Bobby had fallen down the stairs onto the sidewalk.

Barbara Peters testified that Bobby was not a planned child. She financially supported both Bobby and

Jacobsen and worked from 5 p.m. to midnight during the week and bartended on weekends. During the time she was working, Jacobsen watched Bobby. Peters stated she trusted Jacobsen with Bobby and felt Bobby was safe with him. Peters had seen Jacobsen use cocaine once or twice around December 1987.

Peters testified she never saw Jacobsen abuse Bobby and she never willfully caused or permitted Jacobsen to abuse Bobby. Peters stated she never saw Jacobsen hit or strike Bobby, nor did Jacobsen ever strike her. She never saw Jacobsen get angry with Bobby. She never saw Jacobsen reprimand Bobby.

While Peters knew about the burn on Bobby's back, she accepted Jacobsen's explanation that he had spilled hot tea on Bobby and had taken the child to the emergency room. Also, while she did from time to time notice bruises on the boy, she stated that Bobby was small for his age and clumsy. Since he bruised easily, she was not alarmed when she saw bruises.

Peters testified that in November 1987, she saw Jacobsen throw a chunk of ice at Bobby that hit him in the head. Peters told Jacobsen to be careful because Bobby would get whiplash.

Peters stated the last time she saw Bobby alive was on December 16, 1987. She testified she was with Bobby all day but never changed his diapers or pajamas. She stated that she had not given Bobby a bath or changed his diapers for three weeks before Bobby died. She only saw Bobby fully dressed. Peters stated that when Bobby was discovered to be blue, neither she nor Jacobsen called an ambulance. Instead, she drove with Bobby and Jacobsen to LaGrange Memorial Hospital.

On cross-examination, when shown a photograph of Bobby's bruised face, Peters remembered Bobby's face being bruised, but did not remember seeing "that many" bruises on his face and the bruises were "[n]ot that big."

Peters also remembered seeing the bruises on Bobby's hand that were depicted in the photograph, but had accepted Jacobsen's explanation that Bobby had been playing in his room and the crib had fallen on his fingers.

When questioned about Bobby's scheduled visits to the pediatrician, Peters stated she canceled Bobby's November 10 visit because she was feeling sick, and she canceled the November 24 visit because her car would not start. Peters testified that August 11, 1987, was the last time she took Bobby to the pediatrician.

Peters admitted that she told Detective Baldwin she believed Jacobsen was responsible for Bobby's death, and that she may have been negligent at times in leaving Bobby with Jacobsen.

## ANALYSIS

Although the specific facts of the two consolidated cases are, naturally, different, a common theme can be found in them. Both cases involve the death of a child, murdered by the boyfriend of the child's mother. Additionally, in both cases, according to the findings of the trial court, the mother knew of the on-going abuse of the child by the murderer. The issue we must address is whether the mother's knowledge of this on-going abuse, coupled with the continued, sanctioned exposure of the child to this abuse, is sufficient to hold the mother accountable for the murder of the child.

Both defendants contend they cannot be held accountable for the murder of their child because the State did not prove beyond a reasonable doubt that they aided and abetted another in the commission of an offense with the concurrent specific intent to promote or facilitate the commission of that offense. The accountability statute at issue states as follows:

"§5—2. When Accountability Exists. A person is legally accountable for the conduct of another when:

\* \* \*

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).

A charge based upon accountability must necessarily flow from the principal crime at issue. Accountability is not in and of itself a crime, but rather a method through which a criminal conviction may be reached. Simply, the statute is a statement of the principles of accessoryship. (Ill. Ann. Stat., ch. 38, par. 5—2, Committee Comments, at 235 (Smith-Hurd 1989).) Individuals are not charged with the offense of accountability. Instead, they may be charged, as here, with murder, with their guilt established through the behavior which makes them accountable for the crimes of another.

The defendants contend that intent as set forth in the statute means specific intent and differs from the State's interpretation. The defendants believe accountability requires a specific intent to promote or facilitate the commission of a criminal offense. In other words, according to the defendants' interpretation of the statute, they may only be convicted if they had the specific intent to aid the principals, Stanciel and Jacobsen, in the murders of Electicia and Bobby. The State counters that murder is not a specific intent crime. It is a general intent crime requiring only that the individual charged commit some act, the natural tendency of which is to destroy another's life. The State believes that because murder requires only general intent, it would be illogical and inconsistent to require specific intent when the murder charge is based on a theory of accountability.

The rules of statutory construction require that, where the language of a statute admits to two constructions, one of which would make an enactment absurd

and illogical, while the other renders it reasonable and sensible, the construction which leads to an absurd result must be avoided. (*Mulligan v. Joliet Regional Port District* (1988), 123 Ill. 2d 303, 312-13.) Here, requiring specific intent for accountability to murder would be illogical and inconsistent with the murder requirement of general intent. Also, as the appellate court in the Peters case recognized, there is no requirement of specific intent in the statute. (224 Ill. App. 3d at 193.) Defendant's argument thus fails.

Accountability, tied as it is to the crime charged, must comport with the requirements of that crime. Thus, for example, the charge of assault with intent to rape, a specific intent crime, must require a specific intent for one who is accountable as well. Under this analysis, then, one whose guilt of murder, a general intent crime (*People v. Bartall* (1983), 98 Ill. 2d 294), is established through accountability, need only possess a general intent, with all the requirements that state of mind entails.

The appellate court cases cited by the defendants, wherein "intent" is equated with "specific intent," stem from *People v. Ramirez* (1968), 93 Ill. App. 2d 404. The court in *Ramirez*, in equating intent with specific intent, offered no basis or rationale for the assertion. Therefore, we reject that interpretation.

The question thus arises, Did the defendants possess the general intent requirement to sustain their convictions for murder? For this purpose, it is sufficient to show that the defendants voluntarily and willfully committed an act, the natural tendency of which is to destroy another's life. (*Bartall*, 98 Ill. 2d at 307.) Intent may be inferred from the character of defendant's acts as well as the circumstances surrounding the commission of the offense. (*People v. Terrell* (1989), 132 Ill. 2d 178, 204.) Addressing this standard to accountability, the intent to promote or facilitate a crime may be shown by

evidence that the defendant shared the criminal intent of the principal, or by evidence that there was a common criminal design. (*People v. Terry* (1984), 99 Ill. 2d 508; *People v. Allen* (1974), 56 Ill. 2d 536.) The evidence presented at the trials and the findings of the trial courts establish this purpose.

In the case of Violetta Burgos, the evidence is striking. Although ordered for the sake of her daughter to break off all ties with Stanciel, she not only disobeyed this directive, but authorized his role as the child's disciplinarian. The extent and severity of the injuries to Electicia clearly show a record of abuse from which the trier of fact could infer not only Burgos' sanction of, but also active participation in, the abuse which led to the child's death. The reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact (*People v. Brisbon* (1985), 106 Ill. 2d 342), and a criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt (*People v. Collins* (1985), 106 Ill. 2d 237). We cannot say the trial court's inference was unreasonable. Thus, the common criminal design standard was satisfied.

In the case of Barbara Peters, the extent and severity of abuse to her child is clear. The testimony of Karen Wagner established the existence of the abuse several months before the child's death. The burns and bruises went beyond mere clumsiness. The statement of Peters that "I told you this would happen" supports the trial court's inference that she had knowledge of Jacobsen's abusive behavior. Finally, the continued arrangement of Jacobsen's control over the child sufficiently satisfies the common criminal design standard.

Burgos and Peters also both argue that they may not be held accountable for the murders where they did not aid the principals in the abuse which resulted in the

death of the children. Although the law does not generally require an individual to come to the aid of another, certain relationships exist which require such action. Criminal conduct may arise not only by overt acts, but by an omission to act where there is a legal duty to do so. LaFave and Scott address this duty in their treatise on criminal law:

"Some statutory crimes are specifically defined in terms of omission to act. With other common law and statutory crimes which are defined in terms of conduct producing a specified result, a person may be criminally liable when his omission to act produces that result, but only if (1) he has, under the circumstances, a legal duty to act, and (2) he can physically perform the act. The trend of the law has been toward enlarging the scope of duty to act." W. LaFave & A. Scott, Criminal Law §26, at 182 (1972).

The authors recognize the parent-child relationship as creating a duty to act:

"The common law imposes affirmative duties upon persons standing in certain personal relationships to other persons—upon parents to aid their small children, upon husbands to aid their wives, upon ship captains to aid their crews, upon masters to aid their servants. Thus a parent may be guilty of criminal homicide for failure to call a doctor for his sick child, a mother for failure to prevent the fatal beating of her baby by her lover, a husband for failure to aid his imperiled wife, a ship captain for failure to pick up a seaman or passenger fallen overboard, and an employer for failure to aid his endangered employee. Action may be required to thwart the threatened perils of nature (e.g., to combat sickness, to ward off starvation or the elements); or it may be required to protect against threatened acts by third persons." W. LaFave & A. Scott, Criminal Law §26, at 184 (1972).

This court over a century ago recognized the duty of a parent to care for his child. (*People ex rel. O'Connell v. Turner* (1870), 55 Ill. 280, 284-85.) Although both Peters

and Burgos argue they did not aid the principals in the pattern of abuse which resulted in the death of the children, the evidence presented against both defendants is sufficient to provide the inference that they both either knew or should have known of the serious nature of the injuries which the victims were sustaining. Under the present circumstances, we hold the defendants had an affirmative duty to protect their children from the threat posed by Jacobsen and Stanciel. Rather than fulfill that obligation, the defendants entirely ignored the danger posed by these two men, and in doing so aided them in the murders of Bobby and Electicia.

Peters makes several additional arguments in support of her argument for reversal of her conviction. The first additional question to be resolved concerns the absence of Peters from her home at the time Bobby was murdered. The argument advanced states that, because Peters was not present when the fatal blows were struck, she could not have aided Jacobsen in the murder. This argument fails for two reasons.

First, actual presence at the commission of a crime is not a requirement of accountability. (Ill. Rev. Stat. 1991, ch. 38, par. 5—2.) Second, a defendant may be found to have aided and abetted without actively participating in the overt act itself. (*People v. Ruiz* (1982), 94 Ill. 2d 245.) In Peters' case, the aid rendered may be found in Peters' act of placing Bobby in the control of the principal, a known abuser. This delegation of exclusive control of the child to Jacobsen constituted the act of aiding a principal under the accountability statute.

Defendant Peters asserts that accountability does not include those who merely possess knowledge that a crime is being or is about to be committed. While this is true, it does not aid the defendant who, as we have determined, also possessed the requisite intent to come within the purview of the statute.

Defendant Peters next contends that a failure to reverse the appellate court judgment will result in the prosecution of parents for crimes committed upon their children solely by virtue of the common law duty to protect and care for them, regardless of the intent of the parents in committing these crimes. Defendant's argument ignores the point that intent is still a requirement, and that guilt must still be proven through the knowledge and sanction of a danger.

Defendant Peters makes one other allegation of error, that concerning the testimony of Dr. Nancy Jones. Defendant alleges Dr. Jones improperly testified beyond the scope of her expertise in stating that Bobby's physical condition at the time of his death was the result of "on-going abuse." The defendant asserts that Dr. Jones' opinion was the result of conjecture or guess. We disagree.

Dr. Jones was a board-certified pathologist who had conducted over 1,500 autopsies, more than 200 of which were on children under two years of age. The defendant stipulated to her education, experience and board certification in the fields of anatomic, clinical, and forensic pathology. Being an expert in those fields, Dr. Jones was competent to render an opinion as to the cause of Bobby's physical condition at the time of his death. Along with the autopsy results on Bobby, Dr. Jones reviewed the child's medical records, a permissible reference from which to form an opinion. (*Wilson v. Clark* (1981), 84 Ill. 2d 186.) These records on Bobby show a dramatic reversal of his growth rate approximately six months before his death, beginning around the time Peters began seeing Jacobsen. Bobby's height and weight dropped off the normal development curve around this time, and Dr. Jones could find no physiological reason, such as an illness or a natural disease process, which would explain this. Her review of these records, together with the

child's physical condition at the time of his death, was the basis for her opinion that the child suffered from ongoing abuse prior to his death. Further, the judge was free to accept or reject this testimony. We cannot say this testimony was improper on this basis.

For the foregoing reasons, the judgment of the appellate court in No. 73097, regarding Violetta Burgos, is reversed and her conviction reinstated. We note that Burgos raised an additional issue in the appellate court concerning sentencing which that court did not address. We therefore remand to the appellate court for a determination on the sentencing issue raised by Burgos. The judgment of the appellate court in No. 73184 is affirmed.

No. 73097—*Appellate court reversed;*
*cause remanded;*
No. 73184—*Affirmed.*