NOTICE
Decision filed 04/28/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240822-U

NO. 5-24-0822

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Macon County. |
| v. | ) ) | No. 19-CF-321 |
| ANTHONY MYERS, | ) ) ) | Honorable Thomas E. Griffith Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court properly dismissed defendant's postconviction petition where he provided no new evidence to support his claim of actual innocence, no affidavits or other supporting documentation to support his claims of ineffective assistance of counsel, and his claim that pretrial publicity denied him a fair trial was conclusory and unsupported by any specific factual allegations. As any argument to the contrary would lack merit, we grant defendant's appointed counsel on appeal leave to withdraw and affirm the circuit court's judgment.

¶ 2    Defendant, Anthony Myers, appeals the circuit court's order summarily dismissing his postconviction petition. His appointed appellate counsel, the Office of the State Appellate Defender (OSAD), concludes that there is no reasonably meritorious argument that the court erred in doing so. Accordingly, it has filed a motion for leave to withdraw as counsel on appeal and a supporting memorandum. See *Pennsylvania v. Finley*, 481 U.S. 551 (1987). OSAD has notified defendant of its motion, and this court has given him ample opportunity to respond. However, he

1

has not done so. After considering the record on appeal and OSAD's motion and supporting memorandum, we agree that there is no issue that could support an appeal. Accordingly, we grant OSAD leave to withdraw and affirm the circuit court's judgment.

¶ 3                                    BACKGROUND

¶ 4     The State charged defendant with the first degree murder of two-year old T.B. The State alleged that defendant removed the only heat source from T.B.'s bedroom and failed to provide her with proper nourishment and hydration, resulting in her death. The State sought an extended-term sentence on the grounds that T.B. was under 12 years old and her death was the result of exceptionally brutal and heinous behavior. A second count charged defendant with endangering the life or health of a child based on similar allegations. Prior to trial, T.B.'s mother, Twanka Davis, pled guilty to one count of first degree murder in exchange for a 20-year prison sentence.

¶ 5     The jury found defendant guilty on both counts but did not find that he engaged in exceptionally brutal or heinous behavior. The court sentenced him to 30 years' imprisonment.

¶ 6     On direct appeal, defendant argued that the evidence was insufficient to prove beyond a reasonable doubt his guilt of first degree murder. He asked the Fourth District to reduce his conviction to one for endangering the life or health of a child.[1] After extensively considering the evidence and the mental states for the respective crimes, the Fourth District declined defendant's invitation and affirmed the murder conviction. *People v. Myers*, 2022 IL App (4th) 200592-U.

¶ 7     Defendant then filed the instant postconviction petition, alleging that (1) he was actually innocent; (2) trial counsel was ineffective for (a) failing to investigate a Facebook message between defendant and Davis relevant to the State's allegation of guilty knowledge, (b) failing to argue that medical records showed that T.B. had a history of poor weight gain, and (c) failing to

---

[1]This case is now properly in this court due to redistricting.

call a medical examiner from Rush Hospital; and (3) he was denied a fair trial due to extensive pretrial publicity. He attached affidavits from himself and Davis.

¶ 8    The trial court summarily dismissed the petition. Defendant timely appealed.

¶ 9                                    ANALYSIS

¶ 10    OSAD concludes that there is no reasonably meritorious argument that the trial court erred in dismissing defendant's petition because its claims were nonmeritorious. OSAD first suggests that defendant's actual innocence claim lacked merit because the evidence defendant provided in support was not newly discovered and would not likely change the result on retrial. We agree. To explain this conclusion, we set forth at length the evidence as summarized in the Fourth District's opinion on direct appeal.

¶ 11    T.B. was the biological daughter of Twanka Davis and Dartavious Barnes. They separated, and when T.B. was about a year old, Davis began a relationship with defendant. In 2017, Davis and defendant moved to Decatur, where they lived with T.B. and their biological son, Anthony Jr.

¶ 12    Later that year, Barnes, during visitation with T.B., noticed wounds on her arms, face, and back. He telephoned the Department of Children and Family Services (DCFS), which began an investigation. DCFS visited defendant and Davis's house in Decatur, which it found to be strewn with trash and dog feces and infested with ticks and cockroaches. T.B. had a rash on her arm that resembled bedbug bites. Her bedroom contained a mattress with no sheets. The downstairs lacked heat. DCFS thus removed T.B. and Anthony Jr. from the residence.

¶ 13    A DCFS contractor prepared a service plan for Davis and defendant. The plan included a parenting course. According to Cynthia Cherry, a parenting instructor at Webster-Cantrell, defendant volunteered answers in class and was, by all appearances, intelligent. In the final class,

he correctly identified hunger as a factor that caused a child to suffer stress. He successfully completed the parenting course, receiving a score of 96% on the final examination.

¶ 14 The service plan also included supervised visitation. Caseworker IeMonei Bradford testified that she supervised visits between defendant, Davis, and T.B. in the spring and summer of 2018. According to Bradford, defendant interacted with T.B. like "a father figure in the household," and he stated that he viewed T.B. "[l]ike a daughter." Another caseworker, Shawna Spence, testified that, except for an unwillingness to change T.B.'s diapers, defendant treated T.B. no differently than he treated his biological son. The agency staff "considered [defendant] a parental figure" to T.B., and he never intimated that if T.B. were returned home, he would refuse to take care of her. Indeed, if defendant had so suggested, T.B. would likely not have been returned home.

¶ 15 Amanda Beasley-Ricks supervised some of the visitations. Whenever she was in the family residence, there was food in the house. She did not recall T.B. ever refusing food. The home had been "brought up to par" and met at least minimal parenting standards in that it had food and running water and was clean and free of environmental hazards. A new furnace had been installed. Therefore, DCFS returned T.B. to defendant and Davis's custody and closed the case. When Beasley-Ricks last saw T.B., she did not appear to be malnourished.

¶ 16 Barnes testified that when he last saw T.B., at an October 2018 court hearing, she looked healthy. He testified that after Davis and defendant regained custody, defendant refused to allow him to visit T.B. even though he requested visitation.

¶ 17 At 7:48 a.m. on February 11, 2019, Davis called 911 to report that T.B. was unresponsive and not breathing. Davis could be heard requesting defendant to assist her.

4

¶ 18    Police and paramedics found T.B. lying on a bedroom floor, wrapped in a dirty blanket that reeked of urine and excrement. Her eyes were open but glazed over. The lower part of her body was covered in dirt and excrement. There was discoloration or bruising around her right ankle. Her back and hair were smeared with excrement and dirt. In her bedroom was a mattress on a bedframe, without a pillow or a blanket. On the floor of her bedroom, among child feces, were an empty vodka bottle and a few microwave food containers, all of which were empty except for one that contained what appeared to be red beans, rice, and noodles. Under the bed were scraps of paper that appeared to have been gnawed by a rodent. The whole house was grimy, littered with trash, beer cans, liquor bottles, rotten food, soiled diapers, and the feces of humans and rats.

¶ 19    T.B. was taken to the hospital, where she was pronounced dead. Her body temperature was 32 degrees.

¶ 20    Two Decatur police officers, Sean Bowsher and James Wrigley, testified that when they arrived at the house at 8:40 a.m. on February 11, 2019, the outside temperature was approximately 30 degrees, and the downstairs thermostat, which was set at 75 degrees, indicated that the indoor temperature was 45 degrees. It had been cold outside for the past few days.

¶ 21    Two space heaters were found in the bedroom in which defendant, Davis, and Anthony Jr. had spent the night. There was no space heater, however, in T.B.'s room.

¶ 22    On February 12, 2019, a forensic pathologist, Dr. Scott Denton, performed an autopsy on T.B. He found that the body weighed only 21 pounds, which was in approximately the fifth percentile for her age.

¶ 23    Denton's examination of T.B.'s body found "multiple scars that were unusual for a child of two years and ten months old." The nature of the scars indicated past trauma or an injury that had healed and scarred over, which was consistent with a "nonaccidental injury."

5

¶ 24    Denton also found evidence of dehydration and chronic malnutrition. The thymus gland was shrunken and severely atrophied, as happened when someone was starved. "For the tissue itself and the organ to recede like that," Denton opined, "it's not a short process. It's—I would say it's at least several weeks to many months or possibly a month." In her stomach, T.B. had submucosal hemorrhages, which were indicative of hypothermia. Such "petechiae within the stomach," Denton explained, were the result of "[b]eing exposed to cold that causes your body to kind of shut down and cause[s] those bleedings in your stomach." In T.B.'s colon, he found "a lot of firm, dark, green fecal material, basically constipation," the result of "dehydration, and also not eating adequate food." The swelling that Denton found in T.B.'s brain, the high nitrogen content in her kidneys, and the "severe elevation of sodium and chloride" in her eye fluid were, he explained, further indications of "chronic and ongoing" dehydration.

¶ 25    Denton explained that the primary symptom exhibited by a child in T.B.'s condition would be "lethargy. They basically are just—their systems are shutting down, so they're quiet. They're not really crying, they're not in any kind of distress. They just kind of fade away and go into a coma and die."

¶ 26    Denton opined that someone in T.B.'s condition in a cold environment would die of exposure within hours. The immediate cause of her death was cold exposure due to environmental neglect, with dehydration and malnutrition due to neglect as contributing factors.

¶ 27    The parties stipulated that T.B. underwent three medical examinations in 2018, when she was still in DCFS custody. On January 26, 2018, she weighed 22.2 pounds. On April 12, 2018, she weighed 22.6 pounds. On July 18, 2018, she weighed 25.8 pounds. In each examination, she was found to be in good health.

¶ 28    Davis testified that, in February 2019, she was a stay-at-home mother. Defendant was "periodically" employed in lawn care but was more active in that field in the summer than in the winter. Davis first testified that defendant helped care for Anthony Jr. but not T.B. Later, however, she admitted that, in the winter of 2018 and 2019, she was suffering from depression and, consequently, defendant primarily took care of T.B. during those months. Davis testified that defendant accepted T.B. as his daughter and had told DCFS that he would take care of her like his own daughter.

¶ 29    Davis testified that defendant paid the heat and water bills and bought groceries for the household. She insisted that in the winter of 2019 she and defendant had food to eat, and that Anthony Jr. was healthy and well-fed—so well-fed, in fact, that other people called Anthony Jr. "Chunky Baby."

¶ 30    To keep down the electricity bill, the lights in the house were shut off unless Davis or defendant were cooking or eating. A plumbing problem curtailed water consumption. Davis testified that because the line supplying water to the house was ruptured, the water was turned off. So, in February 2019, when T.B. died, the house lacked running water. Whenever water was needed, someone had to go down into the basement, turn on the water main long enough to fill up a bucket, and then carry the bucket upstairs.

¶ 31    According to Davis, she turned off the furnace at 5 p.m. on February 10, 2019, which defendant knew. While the furnace was off, the house had no other heat source other than two space heaters. T.B. was alone in her bedroom, dressed only in a T-shirt. Typically, one of the space heaters was kept in T.B.'s bedroom. However, that night, the space heater was moved from T.B.'s bedroom and into the one that defendant, Davis, and Anthony Jr. occupied. Thus, the night of February 10, 2019, during which the furnace was off, both space heaters ended up in defendant

and Davis's bedroom, and no space heater was in T.B.'s bedroom. At trial, Davis claimed to be unable to remember who had removed the space heater from T.B.'s bedroom.

¶ 32    Davis admitted that she told Barnes in a telephone conversation in July 2020 that defendant "shut the heat off and he removed the space heater from the room." She testified that only one of the two space heaters functioned properly, the one kept in T.B.'s room.

¶ 33    Robert Maynard, an investigator with the Macon County state's attorney's office, testified that Davis told him that defendant had removed the space heater but that, for two reasons, Davis did not want defendant to get in trouble. First, she did not think that defendant had intended to harm T.B. Second, defendant's mother had been pressuring Davis not to implicate her son because she believed that, if he were acquitted, he would regain custody of Anthony Jr. and Davis's other daughter. Davis admitted that she was still in love with defendant. She, too, believed that, if acquitted, defendant would obtain custody of Anthony Jr. and their daughter.

¶ 34    Davis testified that T.B. had been in her bedroom all day. She said that she put her in her room as punishment because she had been "acting up." She told her on the morning of February 10 that she could come out but admitted that she could not leave on her own because she physically could not open the door.

¶ 35    With T.B. still effectively confined to her room, Davis went to bed, by her account, around 8:30 p.m. on February 10, 2019. Both space heaters were in Davis's bedroom. She testified, however, that the space heater that had been taken from T.B.'s bedroom did not work anyway and would not have kept T.B. warm. (Moments before, she had testified that this space heater was the only one that "functioned properly.") Around 6 a.m. on February 11, 2019, Davis heard a noise from T.B.'s bedroom as if someone were talking. However, she did not get up and check on T.B.

8

at that time. When Davis brought T.B. breakfast later that morning, she found her naked, cold, and unresponsive on the bedroom floor. T.B. had removed her T-shirt before she died.[2]

¶ 36    On cross-examination, Davis testified that it had been her role to take care of the children and the home whereas defendant made money to support the household. After DCFS became involved, defendant did not do much to take care of T.B. because he had previously been accused of "doing stuff" to T.B. and he was worried that if he acted as her primary caretaker, he would be accused again.

¶ 37    Nevertheless, Davis admitted, defendant would cook for the family, would take T.B. food sometimes, and would help with Anthony Jr. Also, Davis admitted telling her mother and Barnes that, in the days leading up to T.B.'s death, Davis was having mental health problems that prevented her from performing her parental responsibilities. She claimed, however, that, until the morning when she was found dead, T.B. had been acting normally. Davis denied that T.B. had looked sick.

¶ 38    On redirect, however, Davis acknowledged telling Barnes during a phone call, "We knew something was wrong because she didn't ever eat. She stayed up all night and she always just would stand by the window and look out the window."

¶ 39    Davis also said that whenever she was depressed, she had difficulty taking care of the children, including feeding them, and that she had been depressed every day for the entire year preceding T.B.'s death.

¶ 40    In a lengthy colloquy quoted verbatim by the Fourth District, Davis admitted that while depressed she made meals for the family no more often than "every couple of days" and that, when

---

[2]According to Denton, victims of hypothermia can become so cold that their body is fooled into thinking it is overheated. Under the delusion that they need to cool off, they remove their clothing.

she did not do so, defendant undertook the responsibility of feeding the family. *Myers*, 2022 IL App (4th) 200592-U, ¶ 41.

¶ 41    In considering defendant's claim that the evidence did not prove his guilt of murder beyond a reasonable doubt, the Fourth District reasoned as follows. Defendant was convicted of murder in that he performed acts which he knew would " 'create a strong probability of death or great bodily harm to that individual or another.' " *Id.* ¶ 65 (quoting 720 ILCS 5/9-1(a)(2) (West 2018)). "Act" in this context includes the failure to act when there is a duty to do so. *Id.* ¶¶ 65-67 (citing 720 ILCS 5/2-2 (West 2018); *People v. Stanciel*, 153 Ill. 2d 218, 236 (1992)). Defendant had such a duty toward T.B. in this case because he stood *in loco parentis* to her. *Id.* ¶ 67.[3] "On pain of possible criminal liability for murder, parents—and those standing *in loco parentis* [citation]— must take action to protect the children in their care against 'the threatened perils of nature (*e.g.*, to combat sickness, to ward off starvation or the elements).' " (Internal quotation marks omitted.) *Id.* (quoting *Stanciel*, 153 Ill. 2d at 236). Thus, "even if it were Davis instead of [defendant] who removed the space heater from [T.B.]'s bedroom and placed it in Davis's and [defendant]'s bedroom, at the foot of their bed, that fact would not necessarily save [defendant] from criminal liability for murder. As someone who had chosen to stand *in loco parentis* to [T.B.], [defendant] could commit a knowing first degree murder of her by failing to act—such as by failing to turn on the furnace, failing to move the space heater back into her bedroom, failing to make sure she had adequate blankets and clothing to protect her against freezing temperatures, and failing to make sure that she received enough food and water." *Id.* ¶ 68 (citing *Stanciel*, 153 Ill. 2d at 236).

¶ 42    The court found that the evidence was sufficient to prove this, stating:

---

[3]The court found that the jury's implicit finding in this regard was reasonable given the caseworkers' testimony and defense counsel's acknowledgement in closing argument that defendant had accepted his responsibility as T.B.'s surrogate parent.

"[T]he jurors could have credited Davis's admission to [Barnes] that ' "[w]e" '—meaning she and Myers—' "knew something was wrong because she didn't ever eat" ' and that [T.B.] ' "just would stand by the window and look out the window." ' According to Dr. Denton's testimony, [T.B.] had not had much to eat in a long time, 'at least several weeks to *** possibly a month,' and she would have been fading away, *i.e.*, spending all her time gazing listlessly out the window or lying on the bedroom floor. That this state of affairs escaped [defendant]'s attention could have struck the jury as implausible. The jury could have reasonably inferred [defendant]'s knowledge that (1) [T.B.] was malnourished and thinly clad with little or nothing in the way of bedclothes; (2) with the furnace turned off, her bedroom would become extremely cold when [defendant] or Davis (it little matters who) removed its only heat source, the space heater; and (3) in her frail condition, with almost no protection against the cold, [T.B.] faced a substantial probability of death or great bodily injury. Also, as we already have mentioned, the malice that is evident in the many nonaccidental injuries on [T.B.]'s body increases the reasonableness of such a finding of guilty knowledge." *Id.* ¶ 74.

¶ 43    Defendant asserted in his postconviction petition that he was actually innocent. He relied on an affidavit from Davis, which stated:

"[I] sent non guilty man to prison; his name is Anthony Myers, Sr. We were both convicted of murder of my daughter, [T.B.]. This is the way it really happened[.] I used to beat and starve and leave [T.B.] in a dirty room with piss and shit everywhere. She remind me so much of the mistakes I made with her dad. I wasn't ready to be a mom. I never cleaned[.] I used coke all day, and I got super high and super pissed. Anthony Sr. knew nothing about this.

11

On February 10, 2019, at 7:00 a.m., Anthony Sr. went to the blood bank and Facebook messaged me and said to bathe and bring [T.B.] in our room. I said no. He also told me to clean her room[.] I said no. He came back a little after that, we chilled all day then he made dinner. [T]he heater went out in our room. Anthony Sr. went to turn on the heat, I went and turn it back off. I went to [T.B.'s] room and took her heater and brought it to our room.

[On] February 11, 2019, I [a]woke at 3:00 a.m. I gave Anthony Jr. a snack. I didn't use because I was out. I looked out the window till 7:00 am. At 7:00 a.m., I went and made breakfast, when I got done I split the food. I then went to [T.B.'s] room with Anthony Jr. to feed her. She was laying face down with no clothes on[.] She had no clothes, so she could use the bathroom and I didn't have [to] wash more clothes. I called her name, she didn't move when I did. I called for Anthony Sr., he came running. He picked her up and told me to call 911. He laid her down in our room.

I told 911 she wasn't breathing, they said to check her airways[.] I did and I thought I saw food. Anthony Sr. was turning back on the heat. He never wanted to fight so he let me control everything. So I wouldn't snap out and hurt the kids or him. She had been dead for hours[.] We went down for questioning and were let go. When we got home, I told Anthony Sr. I was going to jail[.] He said everything would be [okay]. Then I told him I hear voices and they tell me to do things. I snap out because my voices told me to. I told him my voices said to hurt y'all before y'all hurt me.

[On] February 13, 2019[,] I was charged with murder. Anthony Sr. is not guilty. He thought I gave her food and water. He thought I cleaned even when I said no. He never seen me hit the kids. He knew I was angry because I would hit him. I was mentally unstable, have been for awhile. I am stable now and owning up to what I did, I murdered my daughter. I took

12

the heater out of her room. I turned off the heat. I beat her all the time. I hated her dad for leaving me to raise her on my own. She looked up to him, I hated that. I did everything and she hated me, so I beat her. He is not guilty[.] I lied[.] Please help him."

¶ 44    Courts may consider a freestanding claim of actual innocence in a postconviction proceeding if the claim is based on newly discovered, material, and noncumulative evidence that the defendant is innocent of the crime for which he was convicted. *People v. Harris*, 206 Ill. 2d 293, 301 (2002). Evidence is considered newly discovered if it was unavailable at trial, could not have been discovered sooner through reasonable diligence, and is so conclusive that it would probably change the result on retrial. *Id.*

¶ 45    Of course, Davis testified at trial. As OSAD points out, some of the statements in her affidavit are consistent with her trial testimony, at most adding additional details, and some are inconsistent. There is a third class of statements—such as who moved the space heater—regarding which her trial testimony was internally inconsistent. However, in no case do the statements in the affidavit provide newly discovered evidence of defendant's innocence.

¶ 46    The Fourth District held that defendant could properly be found guilty of T.B.'s murder even if he committed no overt acts against her. He could be guilty if he failed to act while knowing that his failure to do so created a strong probability that she would suffer death or great bodily harm. The court further held that the evidence was sufficient to prove beyond a reasonable doubt that he did have such knowledge. In her trial testimony, Davis attempted to minimize defendant's involvement in T.B.'s care. But the jury concluded that he was guilty regardless of whether he committed any overt acts against T.B. and the Fourth District affirmed its verdict. Davis's claims that she alone beat and starved T.B. and removed the space heater from her room are not necessarily inconsistent with her trial testimony and would not change the result on retrial. The

13

Fourth District expressly considered the possibility that Davis alone was responsible for T.B.'s deplorable condition and nonetheless affirmed defendant's conviction because, at the very least, he failed to help her when he should have. *Myers*, 2022 IL App (4th) 200592-U, ¶ 74.

¶ 47    Davis's statement that defendant "knew nothing about" her mistreatment of T.B. is not evidence. Davis could not testify about what defendant actually knew. As the Fourth District observed:

> "[T]he jurors could have credited Davis's admission to [Barnes] that ' "[w]e" '—meaning she and Myers—' "knew something was wrong because she didn't ever eat" ' and that [T.B.] ' "just would stand by the window and look out the window." ' According to Dr. Denton's testimony, [T.B.] had not had much to eat in a long time, 'at least several weeks to *** possibly a month,' and she would have been fading away, *i.e.*, spending all her time gazing listlessly out the window or lying on the bedroom floor. That this state of affairs escaped [defendant]'s attention could have struck the jury as implausible. The jury could have reasonably inferred [defendant]'s knowledge that (1) [T.B.] was malnourished and thinly clad with little or nothing in the way of bedclothes; (2) with the furnace turned off, her bedroom would become extremely cold when [defendant] or Davis (it little matters who) removed its only heat source, the space heater; and (3) in her frail condition, with almost no protection against the cold, [T.B.] faced a substantial probability of death or great bodily injury. Also, as we already have mentioned, the malice that is evident in the many nonaccidental injuries on [T.B.]'s body increases the reasonableness of such a finding of guilty knowledge." *Id.*

¶ 48    Defendant's petition also contained several allegations of ineffective assistance of counsel. He attached his own affidavit, which stated:

14

"I have been made aware that a witness that was called upon to testify for the State name[d] [D]artivus [*sic*] Barnes had evidence showing that [I] was innocent. That conversation was made by phone, recorded by IDOC on March 8, 2021. This is evidence in which my trial lawyer failed to investigate when I told him that I had messages telling [T]wanka to care for [T.B.]. I also was made aware that my co-defendant has wrote [*sic*] a notarized affidavit expressing that I had no knowledge. My trial lawyer failed to call [a] medical examiner from Rush Hospital in Chicago, IL[,] who contradicted Dr. [D]enton, EMA[,] and police statements that would [have] shed a different light on Dr. [D]enton's testimony. I did not have a fair trial because my case was highly publicized throughout Decatur, IL[,] leading up to my trial which already formed an opinion before [I] was convicted."

¶ 49 The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)) provides a mechanism by which a criminal defendant may assert that his conviction resulted from a substantial denial of his constitutional rights. *Id.* § 122-1(a); *People v. Delton*, 227 Ill. 2d 247, 253 (2008). Proceedings under the Act are collateral. *People v. Edwards*, 2012 IL 111711, ¶ 21. As a result, issues that were decided on direct appeal or in previous collateral proceedings are barred by *res judicata* (*People v. Pitsonbarger*, 205 Ill. 2d 444, 458 (2002)), and issues that could have been raised earlier, but were not, are forfeited (*People v. Blair*, 215 Ill. 2d 427, 443-44 (2005)).

¶ 50 Section 122-2 of the Act mandates that a postconviction petition "clearly set forth the respects in which the petitioner's constitutional rights were violated" and that it "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2024). Thus, the supreme court has repeatedly held that the failure to attach affidavits or other supporting documentation or explain its absence is "fatal to the petitioner's claims." *People v. Turner*, 187 Ill. 2d 406, 414 (1999).

¶ 51    "To establish that a defendant was deprived of effective assistance of counsel, [he] must establish both that his attorney's performance was deficient and that the defendant suffered prejudice as a result." *People v. Manning*, 227 Ill. 2d 403, 412 (2008) (citing *Strickland v. Washington*, 466 U.S. 668 (1984). To avoid summary dismissal, a postconviction petition alleging ineffective assistance of counsel need only allege that it is arguable that counsel's performance was deficient and that it is arguable that the defendant was prejudiced as a result. *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). In order to establish that defense counsel was deficient, a defendant must overcome the strong presumption that counsel's action or inaction was trial strategy. *Strickland*, 466 U.S. at 689.

¶ 52    Defendant makes several allegations that counsel was ineffective. First, he claims that counsel failed to investigate text messages in Barnes's possession of defendant "telling [T]wanka to care for [T.B.]." The petition included no affidavit from Barnes but, assuming these messages exist, counsel's decision not to present this evidence was sound trial strategy. That defendant felt it necessary to remind Davis to perform basic parental functions could have been viewed by the jury as evidence that defendant had at least an inkling that T.B. was not being cared for properly. Defendant also references Davis's affidavit. As noted, Davis's trial testimony attempted to minimize defendant's responsibility for caring for T.B. and her affidavit provided nothing useful beyond that.

¶ 53    Defendant's contention that counsel should have argued that T.B. had a history of poor weight gain is contradicted by the record. According to the parties' stipulation, T.B. steadily gained weight while in DCFS custody but lost four pounds (more than 20% of her body weight) while in the custody of defendant and Davis.

¶ 54 Defendant further contended that counsel was ineffective for failing "to call [a] medical examiner from Rush Hospital in Chicago, IL[,] who contradicted Dr. [D]enton, EMA[,] and police statements that would [have] shed a different light on Dr. [D]enton's testimony." Defendant does not identify the medical examiner from Rush Hospital[4] or the police officers that he wanted called, or what any of them would have said. As noted, a petition must "have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2024). Specifically, a claim that trial counsel failed to investigate and call a witness must be supported by an affidavit from the proposed witness. *People v. Enis*, 194 Ill. 2d 361, 380 (2000). Without such an affidavit, we have no idea whether the witnesses' testimony would have aided the defense.

¶ 55 Defendant's final claim is that he was denied a fair trial due to pretrial publicity. A defendant is entitled to a trial by an impartial jury. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. An impartial jury is "a jury capable and willing to decide the case solely on the evidence before it." (Internal quotation marks omitted.) *People v. Kirchner*, 194 Ill. 2d 502, 528-29 (2000). There is no requirement that jurors be ignorant of the facts and exposure to pretrial publicity alone does not demonstrate prejudice. *Id.* at 529. There is no presumption of prejudice as a result of a juror's knowledge of pretrial publicity. *People v. Coleman*, 168 Ill. 2d 509, 547 (1995).

¶ 56 Here, defendant provides no details about the extent of pretrial publicity, if any, or whether any of the jurors were exposed to it and thus does not merit further consideration. Nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998).

---

[4]There is no evidence that T.B. was ever treated at Rush Hospital or that anyone from that institution participated in the autopsy.

¶ 57                                    CONCLUSION

¶ 58    As this appeal presents no issue of arguable merit, we grant OSAD leave to withdraw and

affirm the circuit court's judgment.


¶ 59    Motion granted; judgment affirmed.